UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
In re:

                                 **FORMAL OBJECTION TO**
                                 **CONFIRMATION OF**
                                 **PROPOSED AMENDED CHAPTER 11**
                                 **PLAN**

David DePietto,

                                 Chapter 13
                                 Case No. 19-22590-rdd

                        Debtor.
-----------------------------------------------------X

      Michael C. Manniello, an attorney duly admitted to practice before this Court, affirms under penalty of perjury as follows:

      1.      I am duly admitted to practice in the courts of the State of New York and the United States District Court for the SDNY and associated with Roach & Lin, P.C. the attorney of record for Ridgewood Savings Bank (hereinafter "Ridgewood"). I have reviewed the file maintained by this office and based on the documents, pleadings, notes and other memoranda contained herein, I am familiar with the within proceedings.

      2.      I submit this affirmation as formal objection to Debtor's proposed First Amended Chapter 11 Plan dated July 8, 2020 [ECF Doc.# 39] (the "Proposed Plan").

      3.      The jurisdiction of this Court is invoked pursuant to 11 U.S.C. Section 1123 et seq. and the Bankruptcy Amendments and Federal Judgeship Act of 1984.

## BACKGROUND

      4.      On June 27, 2007, a Note evidencing a debt of $788,000.00 was executed by David DePietto (the "Debtor") and given to Ridgewood Savings Bank. As security for said note Debtor also executed a mortgage in the amount of $788,000.00 to Ridgewood Savings Bank which was

duly recorded in the Westchester County Clerk's office on September 18, 2007.  (**See**, **Exhibit "A"** for copy of the Endorsed Note and Recorded Mortgage).

5. Said mortgage constitutes a lien upon the premises known as 22 Walbrooke Rd Scarsdale, New York 10583 (the "Premises") and no other property whatsoever.  The Premises are the Debtors principal residence.

6. On March 8, 2019, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code (the "Petition Date").

7. On June 26, 2019 Ridgewood filed a Proof of Claim, docketed as Claim No: 4, on the Claims Register.

8. As of the Petition Date, Ridgewood's claim reflects a total claim of $1,074,619.27 which includes pre-petition mortgage arrears in the amount of $474,366.82 which are the result of Debtor's default in making the regular monthly mortgage payments to Ridgewood due from March 1, 2013 to date.

9. No objection has been filed to Ridgewood's claim.

10. On June 8, 2020 the Debtor filed a Proposed Plan for Court approval and a Disclosure Statement; an Amended Plan(**Exhibit "B"**)  and Amended Disclosure Statement dated July 8, 2020 (**Exhibit "C"**) were filed July 8, 2020.

**<u>BASIS FOR OBJECTION TO DEBTOR'S AMENDED PLAN</u>**

11. The Proposed Plan lists Ridgewood's claim in Class 2A under Secured Claims and proposes to pay the arrears owed to Ridgewood in the amount of $474,367.00 over the course of seventeen years (204 monthly payments) at the monthly amount of $2,326.00.   The subject loan will mature on July 1, 2037; the Debtor seeks to pay the arrears at issue over the remaining seventeen (17) year life of the mortgage without any interest component.  Such a scheme would certainly impair Ridgewood's claim as the arrears would not be fully cured.

12. The proposed plan incorrectly treats Ridgewood's claim as unimpaired and preventing Ridgewood to vote to accept or reject the Proposed Plan.

Pursuant to 11 U.S.C. §1123(b)

*… a plan may—*

*(1) impair or leave unimpaired any class of claims, secured or unsecured, or of interests;*

*(2) subject to section 365 of this title [11 USCS § 365], provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section;*

*(3) provide for—*
*(A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or*
*(B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest;*

*(4) provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests;*

*(5) modify the rights of holders of secured claims, **other than a claim secured only by a security interest in real property that is the debtor's principal residence**, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; and*

(emphasis added) 11 USC § 1123.

13. Ridgewood's claim "is secured only by a [mortgage] in real property that is the debtor's principal residence", and therefore it may not be modified by the Plan as proposed by the Debtor.  (*In re Van Eck*, 425 BR 54 [Bankr D Conn 2010]).

14. The Plan does in fact seek to modify the secured creditor's claim in violation of Section 1123 in that the Debtor's proposed cure simply takes the arrears and divides them over the remaining life of the mortgage (approximately 204 months).  There is no provision for

payment of the interest accruing g on the arrears from the present until payment is complete 204 months from now.  This is certainly a modification of the secured creditor's rights which should not be permitted.  (See *In re Lennington*, 288 BR 802 [Bankr CD Ill 2003]).  Debtor cites to *Lennington* in its Disclosure Statement as support for its treatment of Ridgewood as being proper.  However, it has been held that whether such treatment is proper and should be approved as not impairing a secured creditor's rights is fact sensitive. (*In re Ruffin*, 2009 Bankr LEXIS 4322 [Bankr DSC Nov. 12, 2009, No. 09-04835-JW]).  In *Lennington,*  the secured creditor's objection was based on the plan providing for a cure of the accelerated pre-petition arrears over the life of the plan therein (60 months), not that the proposed cure of the pre-petition arrears did not contain an interest component because in fact id did. "In their Chapter 11 plan, the DEBTORS propose to cure the prepetition arrearage on the WELLS FARGO mortgage in sixty equal monthly installments, with interest at 9%"  (*In re Lennington*, 288 BR 802, 803 [Bankr CD Ill 2003]).  In the matter at bar, the Debtor does not propose any interest on the pre-petition arrears. It has been held that certain payments are in fact proper to compensate the secure creditor.  Section 1123(d) "provides that notwithstanding Section 1123(a), 'if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy [**18]  law.' 11 U.S.C. § 1123(d) (emphasis added). This provision potentially provides some compensation or protection for the creditor if cure payments are to be made over time, at least to the extent the underlying agreement and applicable nonbankruptcy law  [*800]  provided for interest or other charges on such outstanding amounts.  (*In re LaPorta*, 578 BR 792, 799-800 [Bankr ND Ill 2017]).

15.     Argument could be made that the secured creditor is seeking "interest on interest' as the pre-petition mortgage payments sought to be cures over the life of the Amended Plan

already have monthly interest built in and same should not be allowed.  However,  that interest

component is insufficient to make the creditor whole.  The pre-petition arrears/ payments which

the Debtor seeks to cure over 204 months contain a principal component on which Ridgewood is

entitled to interest until paid and which would not be "interest on interest", but in fact additional

interest on principal to compensate Ridgewood for the cure of the pre-petition arrears occurring

over the 204 months.  Such interest is certainly permitted in this district. (*In re Harko*, 1997

Bankr LEXIS 1176 [BAP 2d Cir July 31, 1997, Nos. 96-50031, 96-50033]).

15.    If the Court allows the proposed Amended Plan to be considered by creditors,

then at the very least as Ridgewood, a secured creditor, will be impaired by the Plan, and it

would be entitled to vote thereon. (*In re RAMZ Real Estate Co., LLC*, 510 BR 712 [Bankr SDNY

2014]).

**WHEREFORE**, the undersigned respectfully requests that the Court: (a) deny

confirmation of the Debtor's proposed Chapter 11 Amended Plan; together with (b) such other and

further relief  to Ridgewood as may be just, proper, and equitable.

Dated:    Syosset, New York
              August 17, 2020

/S/ Michael Manniello
Michael C. Manniello, Esq.
Roach & Lin, P.C.
Attorneys for Ridgewood Savings Bank
6901 Jericho Turnpike, Suite 240
Syosset, NY  11791
(516) 938-3100(x336)

# EXHIBIT A

# FIXED/ADJUSTABLE RATE NOTE
### (One-Year Treasury Index–Rate Caps)

THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

June 27, 2007                                                    PURCHASE, NEW YORK

### 22 WALBROOKE ROAD, SCARSDALE, NEW YORK 10583
[Property Address]

## 1. BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $788,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is RIDGEWOOD SAVINGS BANK. I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 5.875%. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS
### (A) Time and Place of Payments
I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on August 1, 2007. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on July 1, 2037 I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 71-02 FOREST AVENUE, RIDGEWOOD, NEW YORK 11385 or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $4,661.32. This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of JULY, 2012 and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **TWO AND SEVEN EIGHTHS** percentage points (**2.8750%**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **7.875%** or less than **3.875%**. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than **11.875%**.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

MULTISTATE FIXED/ADJUSTABLE RATE NOTE—ONE-YEAR TREASURY INDEX—Single Family—Fannie Mae Uniform Instrument Form 3522 1/01
*(page 2 of 3)*

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

    **(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of FIFTEEN calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 2.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

    **(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

    **(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

    **(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

    **(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
DAVID DEPIETTO – Borrower


_____ (Seal)
- - Borrower


*[Sign Original Only]*



## RIDER TO ADJUSTABLE RATE NOTE

I further promise and agree with Lender as follows:

**12.   CHANGES IN SECTION 5 OF THE NOTE**
If the terms of my loan provide that the initial fixed interest rate on my loan shall remain fixed for a period of at least five years, then Section 5 of the Note is changed to read as follows:
"**5.   BORROWER'S RIGHT TO PREPAY.**
If I make a partial or full prepayment within one (1) year from the date of this Note, there will be a penalty of three months' interest on the amount of my advance payment. If I make a partial or full prepayment after one (1) year from the date of this Note, there will not be any penalty. Advance payments which do not fully pay the amount owed on this Note will not be credited against the amount owed until the first day of the calendar month following the date of advance payment. I shall not be entitled to receive interest on any funds while being held by Lender prior to crediting same nor shall I be entitled to any interest on the amount prepaid.

When I make a prepayment, I will tell the Note Holder in writing that I am doing so. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase."

**13.   CHANGES IN SECTION 7 OF THE NOTE**
(A) The second sentence in Section 7(A) is changed to read as follows:
"The amount of the late charge will be two (2%) percent of my overdue total monthly payment of principal, interest and tax and insurance escrow."
(B) Section 7(B) is changed to read as follows:
"If I do not pay the full amount of each monthly payment including escrow for taxes and insurance within 15 days after it is due, I will be in default."
(C) Section 7(C) will not be effective.

**14.   INTEREST RATE AFTER DEFAULT OF MATURITY**
Notwithstanding any other Section of the Note, I will pay the Note Holder interest at a rate of **16.875%** per annum or the highest rate allowed by law, whichever is lower, from the time of my default in performing any of my obligations pursuant to this Note to the sale of the property following foreclosure and on any deficiency judgment and from the maturity date of this Note.

**15.   ABOVE CHANGES VOID IF NOTE IS SOLD TO FNMA, GNMA, FHLMC, FHLB OF NEW YORK**
If the Federal National Mortgage Association (FNMA), Government National Mortgage Association (GNMA), the Federal Home Loan Mortgage Corporation (FHLMC), Federal Home Loan Bank of New York (FHLB of New York) buys all or some of the Lender's rights under the Note and the Mortgage it secures, or, in any other event, if the Note Holder in writing so elects, the promises and agreements in this Rider will no longer have any force or effect.

DAVID DEPIETTO



| Control Number | Instrument Type |
|---|---|
| | **MTG** |



**WESTCHESTER COUNTY RECORDING AND ENDORSEMENT PAGE**
**(THIS PAGE FORMS PART OF THE INSTRUMENT)**
**\*\*\* DO NOT REMOVE \*\*\***

**THE FOLLOWING INSTRUMENT WAS ENDORSED FOR THE RECORD AS FOLLOWS:**
TYPE OF INSTRUMENT: <u>MTG - MORTGAGE</u>
FEE PAGES: 32        TOTAL PAGES: 32

#### RECORDING FEES

| | |
|---|---|
| STATUTORY CHARGE | $6.00 |
| RECORDING CHARGE | $96.00 |
| RECORD MGT. FUND | $19.00 |
| RP 5217 | $0.00 |
| TP-584 | $0.00 |
| CROSS REFERENCE | $0.00 |
| MISCELLANEOUS | $0.00 |
| **TOTAL FEES PAID** | **$121.00** |

#### TRANSFER TAXES

| | |
|---|---|
| CONSIDERATION | $0.00 |
| TAX PAID | $0.00 |
| TRANSFER TAX # | |

**RECORDING DATE: 9/18/2007**
**TIME: 11:46:00**

#### MORTGAGE TAXES

| | |
|---|---|
| MORTGAGE DATE | 6/27/2007 |
| MORTGAGE AMOUNT | $788,000.00 |
| EXEMPT | Yes |
| COUNTY TAX | $1,970.00 |
| YONKERS TAX | $0.00 |
| BASIC | $3,940.00 |
| ADDITIONAL | $2,334.00 |
| MTA | $1,970.00 |
| SPECIAL | $0.00 |
| **TOTAL PAID** | **$10,214.00** |

**SERIAL NUMBER: CY20920**
**DWELLING: 1-2 Family**

THE PROPERTY IS SITUATED IN
WESTCHESTER COUNTY, NEW YORK IN THE:
TOWN OF GREENBURGH

WITNESS MY HAND AND OFFICIAL SEAL

TIMOTHY C. IDONI
WESTCHESTER COUNTY CLERK

Record & Return to:
RIDGEWOOD SAVINGS BANK
71-02 FOREST AVE

RIDGEWOOD, NY 11385

# WESTCHESTER COUNTY CLERK RECORDING SHEET
110 Dr. Martin Luther King, Jr. Boulevard    White Plains, NY 10601

-------- THIS FORM MUST BE COMPLETED AND SUBMITTED WITH EACH DOCUMENT --------

This page is part of the Instrument; the County Clerk will rely on the information
provided on this page for purposes of indexing this document.
To the best of the submitter's knowledge the information contained on this
Recording Sheet is consistent with the information contained in the attached document.

**SUBMITTER INFORMATION:**    Title Number: ███████████

Company:    Waters Edge Abstract, Inc.

Address:    260 Montauk Highway – Suite 11

City:    Bay Shore    State:    NY    Zip:    11706    Telephone:    631-666-9518

Attention: _____

| | |
|---|---|
| **Document type:**  Mortgage | **# of pages -**  30 |

**Mortgage Amount**  On page __1__ of document

$ 788,000.00

OR

Consideration/Conveyance Amt:

$ _____

**Dwelling Type:**  For Mortgage Only

On page _____ of document

[X] 1 to 2 family

[ ] 1 to 6 family

[ ] Not 1 to 6 family

**1st party name(s) (i.e. grantor/mortgagor)**    Business Entity
On page __1__ of document

Ridgewood Savings Bank    [ ]

_____    [ ]

_____    [ ]

_____    [ ]

_____    [ ]

**Check if submitted:**

[ ] RP-5217 - [ ] $75 [ ] $165
[ ] TP-584 - Type of property conveyed [1 through 8] _____
[ ] TP-584.1    [ ] IT-2663

**2nd party name(s) (i.e. grantee/mortgagee)**    Business Entity
On page _____ of document

David DePietto    [ ]

_____    [ ]

_____    [ ]

_____    [ ]

_____    [ ]

| **TAXES PAID:** | Amount | Reference # Or Check # |
|---|---|---|
| Mortgage Tax | $ 10,214.00 | 1629 |
| Transfer Tax | $ _____ | _____ |
| Mansion Tax | $ _____ | _____ |

| **RECORDING FEES PAID:** | Amount | Reference # or Check # |
|---|---|---|
| | $ 61.00 | 1630 |

**Tax designation   (Section, Block & Lot)**
On page _____ of document
Section 35, Block 1702, Lot 62

**MORTGAGE TAX AFFIDAVITS SUBMITTED:**

[ ] 252  [ ] 255  [ ] 280    Other: _____
[ ] 253  [ ] 260  [ ] 339-ee

**City(ies) or Town(s) for Property Description**
On page _____ of document
Greenburgh

**Cross Reference(s):**    On page _____ of document

_____

_____

**Property Description -- If required, check the one contained within the document.**
On page _____ of document

[X] Metes & bounds

[ ] Lot number on map filed in the Office of the County Clerk

[ ] Refer to deed recorded in the Office of the County Clerk

**Record and Return To:**

The Ridgewood Savings Bank

71-02 Forest Avenue

Ridgewood, NY 11385

Attn: Mortgage Department

RECORD AND RETURN TO:
THE RIDGEWOOD SAVINGS BANK
71-02 FOREST AVENUE
RIDGEWOOD, NEW YORK 11385
ATT: MORTGAGE DEPARTMENT

Section - 35
Block - 1702
Lot - 62
County or Town - WESTCHESTER

---

[Space Above This Line For Recording Data]

# MORTGAGE

WORDS USED OFTEN IN THIS DOCUMENT

**(A) "Security Instrument."** This document, which is dated <u>June 27, 2007,</u> together with all Riders to this document, will be called the "Security Instrument."

**(B) "Borrower."**
<u>DAVID DEPIETTO</u> residing at <u>22 WALBROOKE ROAD, SCARSDALE, NEW YORK 10583,</u> sometimes will be called "Borrower" and sometimes simply "I" or "me."

**(C) "Lender."** "RIDGEWOOD SAVINGS BANK" will be called "Lender." Lender is a corporation or association which exists under the laws of <u>THE STATE OF NEW YORK</u>. Lender's address is <u>71-02 FOREST AVENUE, RIDGEWOOD, NEW YORK 11385.</u>

**(D) "Note."** The note signed by Borrower and dated <u>June 27, 2007,</u> will be called the "Note." The Note shows that I owe Lender <u>Seven Hundred Eighty-Eight Thousand Dollars and No Cents</u> (U.S. <u>$788,000.00</u>) plus interest and other amounts that may be payable. I have promised to pay this debt in Periodic Payments and to pay the debt in full by <u>July 1, 2037.</u>

**(E) "Property."** The property that is described below in the section titled "Description of the Property," will be called the "Property."

**(F) "Loan."** The "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(G) "Sums Secured."** The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

**(H) "Riders."** All Riders attached to this Security Instrument that are signed by Borrower will be called "Riders." The following Riders are to be signed by Borrower [check box as applicable]:

X Adjustable Rate Rider  ☐ Condominium Rider            ☐ Second Home Rider
☐ Balloon Rider          ☐ Planned Unit Development Rider  X Other(s) <u>Rider to Mortgage</u>
☐ 1-4 Family Rider       ☐ Biweekly Payment Rider

NEW YORK--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3033 1/01 *(page 1 of 19 pages)*

**(I)** "**Applicable Law.**" All controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions will be called "Applicable Law."

**(J)** "**Community Association Dues, Fees, and Assessments.**" All dues, fees, assessments, and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization will be called "Community Association Dues, Fees, and Assessments."

**(K)** "**Electronic Funds Transfer.**" "Electronic Funds Transfer" means any transfer of money, other than by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Some common examples of an Electronic Funds Transfer are point-of-sale transfers (where a card such as an asset or debit card is used at a merchant), automated teller machine (or ATM) transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** "**Escrow Items.**" Those items that are described in Section 3 will be called "Escrow Items."

**(M)** "**Miscellaneous Proceeds.**" "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than Insurance Proceeds, as defined in, and paid under the coverage described in, Section 5) for: (i) damage to, or destruction of, the Property; (ii) Condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of Condemnation or sale to avoid Condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property. A taking of the Property by any governmental authority by eminent domain is known as "Condemnation."

**(N)** "**Mortgage Insurance.**" "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)** "**Periodic Payment.**" The regularly scheduled amount due for (i) principal and interest under the Note, and (ii) any amounts under Section 3 will be called "Periodic Payment."

**(P)** "**RESPA.**" "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.


BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY

I mortgage, grant and convey the Property to Lender subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that Applicable Law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

    (A) Pay all the amounts that I owe Lender as stated in the Note including, but not limited to, all renewals, extensions and modifications of the Note;

(B) Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(C) Keep all of my other promises and agreements under this Security Instrument and the Note.


DESCRIPTION OF THE PROPERTY

I give Lender rights in the Property described in (A) through (G) below:

(A) The Property which is located at:

<u>22 WALBROOKE ROAD, SCARSDALE, NEW YORK 10583</u>


This Property is in <u>WESTCHESTER</u> County. It has the following legal description:

<u>See Schedule "A" Attached</u>


(B) All buildings and other improvements that are located on the Property described in subsection (A) of this section;

(C) All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property;"

(D) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;

(E) All fixtures that are now or in the future will be on the Property described in subsections (A) and (B) of this section;

(F) All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and

(G) All replacements of or additions to the Property described in subsections (B) through (F) of this section and all Insurance Proceeds for loss or damage to, and all Miscellaneous Proceeds of the Property described in subsections (A) through (F) of this section.


NEW YORK--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3033 1/01 *(page 3 of 19 pages)*

BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

PLAIN LANGUAGE SECURITY INSTRUMENT

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary in different parts of the country. My promises and agreements are stated in "plain language."

COVENANTS

I promise and I agree with Lender as follows:

1. Borrower's Promise to Pay.

I will pay to Lender on time principal and interest due under the Note and any prepayment, late charges and other amounts due under the Note. I will also pay all amounts for Escrow Items under Section 3 of this Security Instrument. Payments due under the Note and this Security Instrument shall be made in U.S. currency. If any of my payments by check or other payment instrument is returned to Lender unpaid, Lender may require my payment be made by: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.  Payments are deemed received by Lender when received at the location required in the Note, or at another location designated by Lender under Section 15 of this Security Instrument. Lender may return or accept any payment or partial payment if it is for an amount that is less than the amount that is then due. If Lender accepts a lesser payment, Lender may refuse to accept a lesser payment that I may make in the future and does not waive any of its rights. Lender is not obligated to apply such lesser payments when it accepts such payments. If interest on principal accrues as if all Periodic Payments had been paid when due, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until I make payments to bring the Loan current. If I do not do so within a reasonable period of time, Lender will either apply such funds or return them to me. In the event of foreclosure, any unapplied funds will be applied to the outstanding principal balance immediately prior to foreclosure. No offset or claim which I might have now or in the future against Lender will relieve me from making payments due under the Note and this Security Instrument or keeping all of my other promises and agreements secured by this Security Instrument.

**2. Application of Borrower's Payments and Insurance Proceeds**

Unless Applicable Law or this Section 2 requires otherwise, Lender will apply each of my payments that Lender accepts in the following order: First, to pay interest due under the Note; Next, to pay principal due under the Note; and Next, to pay the amounts due Lender under Section 3 of this Security Instrument.

Such payments will be applied to each Periodic Payment in the order in which it became due.   Any remaining amounts will be applied as follows: First, to pay any late charges; Next, to pay any other amounts due under this Security Instrument; and Next, to reduce the principal balance of the Note.

If Lender receives a payment from me for a late Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the late Periodic Payment and the late charge. If more than one Periodic Payment is due, Lender may apply payment received from me: First, to the repayment of the Periodic Payments that are due if, and to the extent that, each payment can be paid in full; Next, to the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Voluntary prepayments will be applied as follows: First, to any prepayment charges; and Next, as described in the Note.

Any application of payments, Insurance Proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date of the Periodic Payments or change the amount of those payments.

**3. Monthly Payments For Taxes And Insurance**

**(a) Borrower's Obligations.** I will pay to Lender all amounts necessary to pay for taxes, assessments, water charges, sewer rents and other similar charges, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, flood insurance (if any), and any required Mortgage Insurance, or a Loss Reserve as described in Section 10 in the place of Mortgage Insurance. Each Periodic Payment will include an amount to be applied toward payment of the following items which are called "Escrow Items:"

(1) The taxes, assessments, water charges, sewer rents and other similar charges, on the Property which under Applicable Law may be superior to this Security Instrument as a Lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "Lien;"

(2) The leasehold payments or ground rents on the Property (if any);

(3) The premium for any and all insurance required by Lender under Section 5 of this Security Instrument;

(4) The premium for Mortgage Insurance (if any);

(5) The amount I may be required to pay Lender under Section 10 of this Security Instrument instead of the payment of the premium for Mortgage Insurance (if any); and

(6) If required by Lender, the amount for any Community Association Dues, Fees, and Assessments.

After signing the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called "Escrow Funds." I will pay Lender the Escrow Funds for Escrow Items unless Lender waives my obligation to pay the Escrow Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Escrow Funds for any or all Escrow Items at any time. Any such waiver must be in writing. In the event of such waiver, I will pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Escrow Funds has been waived by Lender and, if Lender requires, will promptly send to Lender receipts showing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts will be considered to be a promise and agreement contained in this Security Instrument, as the phrase "promises and agreements" is used in Section 9 of this Security Instrument. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may pay that amount and I will then be obligated under Section 9 of this Security Instrument to repay to Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 of this Security Instrument and, upon the revocation, I will pay to Lender all Escrow Funds, and in amounts, that are then required under this Section 3.

I promise to promptly send to Lender any notices that I receive of Escrow Item amounts to be paid. Lender will estimate from time to time the amount of Escrow Funds I will have to pay by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless Applicable Law requires Lender to use another method for determining the amount I am to pay.

Lender may, at any time, collect and hold Escrow Funds in an amount sufficient to permit Lender to apply the Escrow Funds at the time specified under RESPA. Applicable Law puts limits on the total amount of Escrow Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender could require under RESPA. If there is another Applicable Law that imposes a lower limit on the total amount of Escrow Funds Lender can collect and hold, Lender will be limited to the lower amount.

**(b) Lender's Obligations.**

Lender will keep the Escrow Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Escrow Funds. Lender will use the Escrow Funds to pay the Escrow Items no later than the time allowed under RESPA or other Applicable Law. Lender will give to me, without charge, an annual accounting of the Escrow Funds. That accounting will show all additions to and deductions from the Escrow Funds and the reason for each deduction. Lender may not charge me for holding or keeping the Escrow Funds, for using the Escrow Funds to pay Escrow Items, for making a yearly analysis of my payment of Escrow Funds or for receiving, or for verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Escrow Funds and if Applicable Law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Escrow

Funds unless either (1) Lender and I agree in writing that Lender will pay interest on the Escrow Funds, or (2) Applicable Law requires Lender to pay interest on the Escrow Funds.

**(c) Adjustments to the Escrow Funds.**

Under Applicable Law, there is a limit on the amount of Escrow Funds Lender may hold. If the amount of Escrow Funds held by Lender exceeds this limit, then there will be an excess amount and RESPA requires Lender to account to me in a special manner for the excess amount of Escrow Funds.

If, at any time, Lender has not received enough Escrow Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items when the payments are due, but the number of payments will not be more than 12.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Escrow Funds that are then being held by Lender.

**4. Borrower's Obligation to Pay Charges, Assessments And Claims.**

I will pay all taxes, assessments, water charges, sewer rents and other similar charges, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make ground rents or payments due under my lease if I am a tenant on the Property and Community Association Dues, Fees, and Assessments (if any) due on the Property. If these items are Escrow Items, I will do this by making the payments as described in Section 3 of this Security Instrument.   In this Security Instrument, the word "Person" means any individual, organization, governmental authority or other party.   I will promptly pay or satisfy all Liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior Lien if: (a) I agree, in writing, to pay the obligation which gave rise to the superior Lien and Lender approves the way in which I agree to pay that obligation, but only so long as I am performing such agreement; (b) in good faith, I argue or defend against the superior Lien in a lawsuit so that in Lender's opinion, during the lawsuit, the superior Lien may not be enforced, but only until the lawsuit ends; or (c) I secure from the holder of that other Lien an agreement, approved in writing by Lender, that the Lien of this Security Instrument is superior to the Lien held by that Person. If Lender determines that any part of the Property is subject to a superior Lien, Lender may give Borrower a notice identifying the superior Lien. Within 10 days of the date on which the notice is given, Borrower shall pay or satisfy the superior Lien or take one or more of the actions mentioned in this Section 4. Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with the Loan, unless Applicable Law does not permit Lender to make such a charge.

**5. Borrower's Obligation to Maintain Hazard Insurance or Property Insurance.**   I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property. The insurance will cover loss or damage caused by fire, hazards normally covered by "Extended Coverage" hazard insurance policies, and any other hazards for which Lender requires coverage, including, but not limited to earthquakes and floods. The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender. What Lender requires under the last sentence can change during

the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's right to disapprove. Lender may not disapprove my choice unless the disapproval is reasonable. Lender may require me to pay either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect the flood zone determination or certification. If I disagree with the flood zone determination, I may request the Federal Emergency Management Agency to review the flood zone determination and I promise to pay any fees charged by the Federal Emergency Management Agency for its review. If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and will be payable with such interest, upon notice from Lender to me requesting payment. All of the insurance policies and renewals of those policies will include what is known as a "Standard Mortgage Clause" to protect Lender and will name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewals will be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive. If I obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy will include a Standard Mortgage Clause and will name Lender as mortgagee and/or as an additional loss payee. If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so. The amount paid by the insurance company for loss or damage to the Property is called "Insurance Proceeds." Unless Lender and I otherwise agree in writing, any Insurance Proceeds, whether or not the underlying insurance was required by Lender, will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the Insurance Proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c) Lender and I have agreed in writing not to use the Insurance Proceeds for that purpose. During the period that any repairs or restorations are being made, Lender may hold any Insurance Proceeds until it has had an opportunity to inspect the Property to verify that the repair work has been completed to Lender's satisfaction. However, this inspection will be done promptly. Lender may make payments for the repairs and restorations in a single payment or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires otherwise, Lender is not required to pay me any interest or earnings on the Insurance Proceeds. I will pay for any public adjusters or other third parties that I hire, and their fees will not be paid out of the Insurance Proceeds. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then

the Insurance Proceeds will be used to reduce the amount that I owe to Lender under this Security Instrument. Such Insurance Proceeds will be applied in the order provided for in Section 2. If any of the Insurance Proceeds remain after the amount that I owe to Lender has been paid in full, the remaining Insurance Proceeds will be paid to me. If I abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 of this Security Instrument or otherwise, I give Lender my rights to any Insurance Proceeds in an amount not greater than the amounts unpaid under the Note and this Security Instrument. I also give Lender any other of my rights (other than the right to any refund of unearned premiums that I paid) under all insurance policies covering the Property, if the rights are applicable to the coverage of the Property. Lender may use the Insurance Proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Borrower's Obligations to Occupy The Property.**

I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

**7. Borrower's Obligations to Maintain And Protect The Property And to Fulfill Any Lease Obligations.**

**(a) Maintenance and Protection of the Property.** I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate. Whether or not I am residing in the Property, I will keep the Property in good repair so that it will not deteriorate or decrease in value due to its condition. Unless it is determined under Section 5 of this Security Instrument that repair is not economically feasible, I will promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or Condemnation (as defined in the definition of Miscellaneous Proceeds) proceeds are paid because of loss or damage to, or Condemnation of, the Property, I will repair or restore the Property only if Lender has released those proceeds for such purposes. Lender may pay for the repairs and restoration out of proceeds in a single payment or in a series of progress payments as the work is completed. If the insurance or Condemnation proceeds are not sufficient to repair or restore the Property, I promise to pay for the completion of such repair or restoration.

**(b) Lender's Inspection of Property.**

Lender, and others authorized by Lender, may enter on and inspect the Property. They will do so in a reasonable manner and at reasonable times. If it has a reasonable purpose, Lender may inspect the inside of the home or other improvements on the Property. Before or at the time an inspection is made, Lender will give me notice stating a reasonable purpose for such interior inspection.

**8. Borrower's Loan Application.**

If, during the application process for the Loan, I, or any Person or entity acting at my direction or with my knowledge or consent, made false, misleading, or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan (or did not provide Lender with such information), Lender will treat my actions as a default under this Security Instrument. False, misleading, or inaccurate statements about information important to Lender would include a misrepresentation of my intention to occupy the Property as a principal residence. This is just one example of a false, misleading, or inaccurate statement of important information.

**9. Lender's Right to Protect Its Rights in The Property.**

If: (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal proceeding in bankruptcy, in probate, for Condemnation or Forfeiture (as defined in Section 11), proceedings which could give a Person rights which could equal or exceed Lender's interest in the Property or under this Security Instrument, proceedings for enforcement of a Lien which may become superior to this Security Instrument, or to enforce laws or regulations); or (c) I have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and Lender's rights under this Security Instrument. Lender's actions may include, but are not limited to: (a) protecting and/or assessing the value of the Property; (b) securing and/or repairing the Property; (c) paying sums to eliminate any Lien against the Property that may be equal or superior to this Security Instrument; (d) appearing in court; and (e) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender can also enter the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, have utilities turned on or off, and take any other action to secure the Property. Although Lender may take action under this Section 9, Lender does not have to do so and is under no duty to do so. I agree that Lender will not be liable for not taking any or all actions under this Section 9. I will pay to Lender any amounts, with interest, which Lender spends under this Section 9. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will pay interest on those amounts at the interest rate set forth in the Note. Interest on each amount will begin on the date that the amount is spent by Lender. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest. If I do not own, but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I acquire the full title (sometimes called "Fee Title") to the Property, my lease interest and the Fee Title will not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.**

If Lender required Mortgage Insurance as a condition of making the Loan, I will pay the premiums for the Mortgage Insurance. If, for any reason, the Mortgage Insurance coverage ceases to be available from the mortgage insurer that previously provided such insurance and Lender required me to make separate payments toward the premiums for Mortgage Insurance, I will pay the premiums for substantially equivalent Mortgage Insurance coverage from an alternate mortgage insurer. However, the cost of this Mortgage Insurance coverage will be substantially equivalent to the cost to me of the previous Mortgage Insurance coverage, and the alternate mortgage insurer will be selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Lender will establish a non-refundable "Loss Reserve" as a substitute for the Mortgage Insurance coverage. I will continue to pay to Lender each month an amount equal to one-twelfth of the yearly Mortgage Insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the Mortgage Insurance would have covered. The Loss Reserve is non-refundable even if the Loan is ultimately paid in full and Lender is not required to pay me any interest on the Loss Reserve. Lender can no longer require Loss Reserve payments if: (a) Mortgage Insurance coverage again becomes available through an insurer selected by Lender; (b) such Mortgage Insurance is obtained; (c) Lender requires separately designated payments toward the premiums for Mortgage Insurance; and (d) the Mortgage Insurance coverage is in the amount and for the period of time required by Lender.  If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separate payments toward the premiums for Mortgage Insurance, I will pay the Mortgage Insurance premiums, or the Loss Reserve payments, until the requirement for Mortgage Insurance ends according to any written agreement between Lender and me providing for such termination or until termination of Mortgage Insurance is required by Applicable Law. Lender may require me to pay the premiums, or the Loss Reserve payments, in the manner described in Section 3 of this Security Instrument. Nothing in this Section 10 will affect my obligation to pay interest at the rate provided in the Note. A Mortgage Insurance policy pays Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy. Mortgage insurers assess their total risk on all Mortgage Insurance from time to time. Mortgage insurers may enter into agreements with other parties to share or change their risk, or to reduce losses. These agreements are based on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include Mortgage Insurance premiums). As a result of these agreements, Lender, any owner of the Note, another insurer, any reinsurer, or any other entity may receive (directly or indirectly) amounts that come from a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or changing the mortgage insurer's risk, or reducing losses. If these agreements provide that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." It also should be understood that: (a) any of these agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. These agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund; and (b) any of these agreements will not affect the rights Borrower has - if any – regarding the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right (a) to receive certain disclosures, (b) to request and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically, and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination.

**11. Agreements About Miscellaneous Proceeds; Forfeiture.**

All Miscellaneous Proceeds are assigned to and will be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds will be applied to restoration or repair of the Property, if (a) the restoration or repair is economically feasible, and (b) Lender's security given in this Security Instrument is not lessened. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to verify that the work has been completed to Lender's satisfaction. However, the inspection will be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on the Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security given in this Security Instrument would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2. In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me. In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Sums Secured will be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Sums Secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to me. In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Miscellaneous Proceeds will be applied to the Sums Secured whether or not the sums are then due. If I abandon the Property, or if, after Lender sends me notice that the Opposing Party (as defined in the next sentence) offered to make an award to settle a claim for damages, I fail to respond to Lender within 30 days after the date Lender gives notice, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the Sums Secured, whether or not then due. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a right of action in regard to Miscellaneous Proceeds. I will be in default under this Security Instrument if any civil or criminal action or proceeding that Lender determines could result in a court ruling (a) that would require Forfeiture of the Property, or (b) that could damage Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" is a court action to require the Property, or any part of the Property, to be given up. I may correct the default by obtaining a court ruling that dismisses the court action, if Lender determines that this court ruling prevents Forfeiture of the Property and also prevents any damage to Lender's interest in the Property or rights under this Security Instrument. If I correct the default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Section 19 of this Security Instrument, even if Lender has required Immediate Payment in Full (as

defined in Section 22). The proceeds of any award or claim for damages that are attributable to the damage or reduction of Lender's interest in the Property are assigned, and will be paid, to Lender. All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

## 12. Continuation of Borrower's Obligations And of Lender's Rights.

### (a) Borrower's Obligations.

Lender may allow me, or a Person who takes over my rights and obligations, to delay or to change the amount of the Periodic Payments. Even if Lender does this, however, I will still be fully obligated under the Note and under this Security Instrument unless Lender agrees to release me, in writing, from my obligations. Lender may allow those delays or changes for me or a Person who takes over my rights and obligations, even if Lender is requested not to do so. Even if Lender is requested to do so, Lender will not be required to (1) bring a lawsuit against me or such a Person for not fulfilling obligations under the Note or under this Security Instrument, or (2) refuse to extend time for payment or otherwise modify amortization of the Sums Secured.

### (b) Lender's Rights.

Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if: (1) Lender obtains insurance, pays taxes, or pays other claims, charges or Liens against the Property; (2) Lender accepts payments from third Persons; or (3) Lender accepts payments in amounts less than the amount then due, Lender will have the right under Section 22 below to demand that I make Immediate Payment in Full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument.

## 13. Obligations of Borrower And of Persons Taking Over Borrower's Rights or Obligations.

If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Note: (a) that Person is signing this Security Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender may agree with the other Borrowers to delay enforcing any of Lender's rights, to modify, or make any accommodations with regard to the terms of this Security Instrument or the Note without that Person's consent. Subject to the provisions of Section 18 of this Security Instrument, any Person who takes over my rights or obligations under this Security Instrument in writing, and is approved by Lender in writing, will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Borrower will not be released from Borrower's obligations and liabilities under this Security Instrument unless Lender agrees to such release in writing. Any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's promises and agreements made in this Security Instrument except as provided under Section 20.

## 14. Loan Charges.

Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. With regard to other fees, the fact that this Security Instrument does not expressly indicate that Lender may charge a certain fee does not mean that

Lender cannot charge that fee. Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law. If the Loan is subject to Applicable Law which sets maximum loan charges, and that Applicable Law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed permitted limits: (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (even if a prepayment charge is provided for under the Note). If I accept such a refund that is paid directly to me, I will waive any right to bring a lawsuit against Lender because of the overcharge.

**15. Notices Required under this Security Instrument.**

All notices given by me or Lender in connection with this Security Instrument will be in writing. Any notice to me in connection with this Security Instrument is considered given to me when mailed by first class mail or when actually delivered to my notice address if sent by other means. Notice to any one Borrower will be notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address is the address of the Property unless I give notice to Lender of a different address. I will promptly notify Lender of my change of address. If Lender specifies a procedure for reporting my change of address, then I will only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated on the first page of this Security Instrument unless Lender has given me notice of another address. Any notice in connection with this Security Instrument is given to Lender when it is actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Law That Governs this Security Instrument; Word Usage.**

This Security Instrument is governed by federal law and the law of New York State. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does not mean that Lender and I cannot agree by contract. If any term of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision. This means that the Security Instrument or the Note will remain as if the conflicting provision did not exist. As used in this Security Instrument: (a) words of the masculine gender mean and include corresponding words of the feminine and neuter genders; (b) words in the singular mean and include the plural, and words in the plural mean and include the singular; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.**

I will be given one copy of the Note and of this Security Instrument.

**18. Agreements about Lender's Rights If the Property Is Sold or Transferred.** Lender may require Immediate Payment in Full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior

written permission. If Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require Immediate Payment in Full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. If Lender requires Immediate Payment in Full under this Section 18, Lender will give me a notice, which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**19. Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.**

Even if Lender has required Immediate Payment in Full, I may have the right to have enforcement of this Security Instrument stopped. I will have this right at any time before the earliest of: (a) five days before sale of the Property under any power of sale granted by this Security Instrument; (b) another period as Applicable Law might specify for the termination of my right to have enforcement of the Loan stopped; or (c) a judgment has been entered enforcing this Security Instrument. In order to have this right, I will meet the following conditions: (a) I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if Immediate Payment in Full had never been required; (b) I correct my failure to keep any of my other promises or agreements made in this Security Instrument; (c) I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) I do whatever Lender reasonably requires to assure that Lender's interest in the Property and rights under this Security Instrument and my obligations under the Note and under this Security Instrument continue unchanged. Lender may require that I pay the sums and expenses mentioned in (a) through (d) in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. If I fulfill all of the conditions in this Section 19, then this Security Instrument will remain in full effect as if Immediate Payment in Full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required Immediate Payment in Full under Section 18 of this Security Instrument.

**20. Note Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Lender's and Borrower's Right to Notice of Grievance.**

The Note, or an interest in the Note, together with this Security Instrument, may be sold one or more times. I might not receive any prior notice of these sales. The entity that collects the Periodic Payments and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Note. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. Applicable Law

requires that I be given written notice of any change of the Loan Servicer. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required by RESPA or Applicable Law. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to me will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser. Neither I nor Lender may commence, join or be joined to any court action (as either an individual party or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other has not fulfilled any of its obligations under this Security Instrument, unless the other is notified (in the manner required under Section 15 of this Security Instrument) of the unfulfilled obligation and given a reasonable time period to take corrective action. If Applicable Law provides a time period which will elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to me under Section 22 and the notice of the demand for payment in full given to me under Section 22 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20. All rights under this paragraph are subject to Applicable Law.

**21. Continuation of Borrower's Obligations to Maintain and Protect the Property.**

The federal laws and the laws of New York State that relate to health, safety or environmental protection are called "Environmental Law." Environmental Law classifies certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Section 21. These substances are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Law and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances." "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law. An "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup. I will not do anything affecting the Property that violates Environmental Law, and I will not allow anyone else to do so. I will not cause or permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. I also will not do, nor allow anyone else to do, anything affecting the Property that: (a) is in violation of any Environmental Law; (b) creates an Environmental Condition; or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The promises in this paragraph do not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property (including, but not limited to, Hazardous Substances in consumer products). I may use or store these small quantities on the Property. In addition, unless Environmental Law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the

asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure). I will promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which I have actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance; and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If I learn, or any governmental or regulatory authority, or any private party, notifies me that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, I will promptly take all necessary remedial actions in accordance with Environmental Law. Nothing in this Security Instrument creates an obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS

I also promise and agree with Lender as follows:

22. Lender's Rights If Borrower Fails to Keep Promises and Agreements.

Except as provided in Section 18 of this Security Instrument, if all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "Immediate Payment in Full."

If Lender requires Immediate Payment in Full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another Person may acquire the Property. This is known as "Foreclosure and Sale." In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by Applicable Law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured. Lender may require Immediate Payment in Full under this Section 22 only if all of the following conditions are met:
    (a) I fail to keep any promise or agreement made in this Security Instrument or the Note, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument;
    (b) Lender sends to me, in the manner described in Section 15 of this Security Instrument, a notice that states:
        (1) The promise or agreement that I failed to keep or the default that has occurred;
        (2) The action that I must take to correct that default;
        (3) A date by which I must correct the default. That date will be at least 30 days from the date on which the notice is given;
        (4) That if I do not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another Person may acquire the Property by means of Foreclosure and Sale;

(5) That if I meet the conditions stated in Section 19 of this Security Instrument, I will have the right to have Lender's enforcement of this Security Instrument stopped and to have the Note and this Security Instrument remain fully effective as if Immediate Payment in Full had never been required; and

(6) That I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have; and

(c) I do not correct the default stated in the notice from Lender by the date stated in that notice.

## 23. Lender's Obligation to Discharge this Security Instrument.

When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will pay all costs of recording the discharge in the proper official records. I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require that I pay such a fee, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted by Applicable Law.

## 24. Agreements about New York Lien Law.

I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that I will: (a) hold all amounts which I receive and which I have a right to receive from Lender under the Note as a trust fund; and (b) use those amounts to pay for "Cost of Improvement" (as defined in Section 13 of the New York Lien Law) before I use them for any other purpose. The fact that I am holding those amounts as a trust fund means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section 24.

## 25. Borrower's Statement Regarding the Property [check box as applicable].

X This Security Instrument covers real property improved, or to be improved, by a one or two family dwelling only.

☐ This Security Instrument covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

☐ This Security Instrument does not cover real property improved as described above.

**BY SIGNING BELOW**, I accept and agree to the promises and agreements contained in pages 1 through 18 of this Security Instrument and in any Rider signed by me and recorded with it.

Witnesses: _____    , AS WITNESS ONLY    _____

_____                    _____ (Seal)
DAVID DEPIETTO - Borrower


_____                    _____ (Seal)
- - Borrower



_____ {Space Below This Line For Acknowledgment}_____

State of New York          )
                            ) ss.:
County of WESTCHESTER      )


    On the **June 27, 2007**, before me, the undersigned personally appeared **DAVID DEPIETTO** (and) — personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Signature and Office of individual
taking acknowledgment

ELIZABETH G. TAUSZ
Notary Public, State of New York
No.: 01TA6006539
Qualified in Westchester County
Commission Expires May 4, 2010

NEW YORK--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3033 1/01 *(page 19 of 19 pages)*

### RIDER TO MORTGAGE

I further promise and agree with the Lender as follows:

### 26. CHANGES AND ADDITIONS TO THE MORTGAGE

This Rider makes certain changes and additions to the attached Mortgage. Whenever the terms, conditions and promises contained in the Mortgage (Paragraphs 1 to 25) differ or are in conflict with this Rider, the provisions of this Rider will control. Any reference in this Rider to the Mortgage shall include any rider to the Mortgage and any reference to the Note shall include any rider to the Note.

**27.** The following subparagraph is added to the paragraph of the Mortgage captioned "Description of the Property:"

"(H) All rents or royalties from the Property described in subparagraph (A) of this section."

### 28. TAXES AND INSURANCE

All references made in the Mortgage to taxes, assessments and ground rents and Escrow Items shall be deemed to include sewer rent and water charges and all references to hazard insurance shall be deemed to include flood insurance. All insurance shall be placed with one or more companies approved by Lender in accordance with Lender's standards.

### 29. FLOOD INSURANCE

I will obtain flood insurance if I am advised that the Secretary of Housing and Urban Development or other Federal agency has determined that the Property is in an area that has been designated as having "special flood hazards." The minimum flood insurance that I will obtain will be an amount equal to the unpaid principal balance due on the mortgage or the maximum flood insurance obtainable by me on the property under the National Flood Insurance Program, whichever is less.

**30.** The sixth unnumbered subparagraph of Paragraph 3(a) of the Mortgage is deleted.

The second sentence of the second unnumbered paragraph of subparagraph 3(b) of the Mortgage is changed to read as follows:

"However, Lender may charge me for these services if the law permits Lender to make such a charge."

The first and second unnumbered paragraphs of subparagraph 3(C) of the Mortgage are changed to read as follows:

"A law may apply to this loan which limits the amount of Funds Lender may hold. If the amount of Funds held by Lender exceeds a limit of a law, if any, which applies to this loan, then the law which applies to this loan, if any, may require Lender to account to me in a special manner for the excess amount of funds. There will be an excess amount if, at any time, the amount of Funds which Lender is holding or keeping is greater than the amount of Funds Lender is allowed to hold under a law, if any, which applies to this loan."

"If there is a shortage of Funds to pay any of the Escrow Items, I agree to pay to Lender immediately on demand whatever amount is necessary to pay the Escrow Items in full. If I do not pay this amount on demand, the Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Mortgage."

### 31. LENDER'S RIGHTS TO INSURANCE PROCEEDS IN THE EVENT OF LOSS

The sixth unnumbered subparagraph of Paragraph 5 of the mortgage is changed to read as follows:

"The amount paid by the insurance company is called "proceeds". The Lender, upon receipt of proceeds, may use the proceeds to reduce the amount I owe to Lender under the Note and under this Mortgage (whether or not repairs have been made by me), or Lender may release the proceeds to me for use in the repair or restoration of the damaged Property.

I will not allow any condition to exist on the Property, which would, in any way, invalidate the insurance on the Property."

## 32.  BORROWER'S OBLIGATIONS TO OCCUPY THE PROPERTY, TO MAINTAIN AND PROTECT THE PROPERTY, AND TO FULFILL ANY LEASE OBLIGATIONS; BORROWER'S LOAN APPLICATION

Subparagraph 6 of the Mortgage is changed to read as follows:

"I will occupy the Property and use the Property as my principal residence unless the Lender agrees in writing that I do not have to do so."

Paragraph 7 of the mortgage is amended to read as follows:

"I will be "in default" under this Security Instrument if I fail to keep any promise or agreement made in the Security Instrument.  I also will be in default under this Security Instrument if any civil or criminal action or proceeding for "forfeiture" (that is a legal action or proceeding to require the Property or any part of the Property to be given up) is begun and the action or proceeding could result in a court ruling (i) that would require forfeiture of the Property; or (ii) that would materially impair the lien of the Security Instrument or Lender's rights in the Property."

## 33.  INTEREST ON AMOUNTS SPENT BY LENDER TO PROTECT THE PROPERTY OR LENDER'S RIGHTS IN THE PROPERTY

I agree to pay interest at the same rate stated in the Note or at the highest rate that the law allows, whichever is higher, on all amounts that I must repay Lender which Lender may spend to protect the Property or Lender's rights in the Property, all as described in Paragraph 7 and Paragraph 9 of the Mortgage.

## 34.  LENDER'S RIGHT TO INSPECT THE PROPERTY

Paragraph 7(b) of the Mortgage is changed to read as follows:

"Lender, and others authorized by Lender, may enter on and inspect the Property. Lender is not required to give me any notice before taking any action to protect the Property or Lender's Rights in the Property or to enter and make an inspection of the Property."

**35.**  Notwithstanding anything to the contrary contain in the Mortgage (including Paragraph 11) the mortgage is amended and changed to read as follows while this Rider is effective:

### "AGREEMENTS ABOUT CONDEMNATION OF THE PROPERTY"

A taking of Property by any governmental authority by eminent domain is known as "condemnation." I give to Lender my right: (a) to proceeds of all awards or claims for damages resulting from condemnation or other governmental taking of the Property; and (b) to proceeds from a sale of the Property that is made to avoid condemnation. All of those proceeds will be paid to Lender.

Unless Lender and I agree otherwise in writing, if all or any part of the Property is taken, the proceeds will be used to reduce the amount that I owe to Lender under the Note and under this Mortgage. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me.

If I abandon the Property, or I do not answer, within 30 days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, the Lender has the authority to collect the proceeds. Lender may then use the proceeds to repair or restore the Property or to reduce the amount that I owe to Lender under the Note and under this Mortgage. The 30-day period will begin on the date the notice is mailed or, if it is not mailed, on the date the notice is delivered.

If any proceeds are used to reduce the amount of principal which I owe to Lender under the Note, that use will not delay the due date or change the amount of any monthly payments under the Note and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to those delays or changes.


CONDEMNATION OF COMMON AREAS OF PUD

If the Property includes a unit in a PUD, the promises and agreements in this Paragraph 35 will apply to a condemnation, or sale to avoid condemnation, of the PUD's common areas and facilities as well as of the Property."

## 36. LEGISLATION AFFECTING LENDER'S RIGHTS

If a change in applicable law would make any provision of the Note or this Security Instrument unenforceable, Lender may require immediate payment in full of all Sums Secured by this Security Instrument as that phrase is defined in Paragraph 22 of the Mortgage. If Lender requires immediate payment in full under this Paragraph, Lender will take the steps and may act as specified in Paragraph 22 of the Mortgage.

## 37. AGREEMENTS ABOUT LENDER'S RIGHT IF THE PROPERTY IS SOLD OR TRANSFERRED

Paragraph 18 of the Mortgage is changed to read as follows:

"The whole of the principal sum hereby secured, and the accrued interest thereon, shall become due and payable at the option of the Lender in the event of the sale, conveyance or any transfer by operation of law of the title to the Property by the Borrower."

## 38. LENDER'S RIGHTS IF BORROWER FAILS TO KEEP PROMISES

Paragraph 22 of the Mortgage is changed to read as follows:

"If I fail to keep any promise or agreement made in this Mortgage, including the promises to pay when due the amounts I owe to Lender, the Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Mortgage. Lender may do this without making any further demand for payment. This requirement will be called "immediate payment in full."

If Lender requires immediate payment in full, I agree to pay interest on the entire amount remaining unpaid at the default rate set forth in the Note or at the highest rate then permitted by law, whichever is lower, from the date I failed to keep any promise or agreement made in the Note or in the Mortgage.

If Lender requires immediate payment in full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and to have the Property sold. At the sale, Lender or another person, may acquire the Property. This is known as "Foreclosure and Sale".

If you start a foreclosure action, you may ask the court to appoint a Receiver to look after the Property and to collect rents from any tenants on the Property. This action may be taken without prior notice to me and without reference to the value of the Property. If I occupy all or any part of the Property, then the Receiver may collect a reasonable charge from me for use and occupancy.

If an action is commenced to foreclose this Mortgage and there is a sale at foreclosure, I agree that the Property may be sold in one parcel. You may ask an attorney either to foreclose this Mortgage, to collect money I owe under the Note and this Mortgage, or to enforce any of the promises I have made. If you do so, you may add all reasonable legal fees, costs, allowances and disbursements to the amount I owe you, together with interest at the rate specified in the Note."

(Rider – page 3 of 6)

**39. DEFENSE OF YOUR RIGHTS**

If you have to defend your rights under the Note and this Mortgage, then any money you have to pay (including reasonable fees of lawyers) shall be added to the amount I owe you. I shall pay this money promptly, at your request, together with interest at the rate specified in the Note.

**40. NO RIGHT TO DISCONTINUANCE OF LAWSUIT**

Paragraph 19 of the Mortgage will not be effective.

**41. LENDER'S RIGHTS TO RENTAL PAYMENTS FROM ME**

If Lender requires immediate payment in full, or if I abandon the Property, then Lender, persons authorized by Lender, or a receiver appointed by a court at Lender's request may: (A) collect the rental payments, including overdue rental payments, directly from the tenants; (B) enter on and take possession of the Property; (C) manage the Property; and (D) sign, cancel, and change leases. If Lender notifies the tenants that Lender has the right to collect rental payments directly from them under this Paragraph, I agree that the tenants may make those rental payments to Lender without having to ask whether I have failed to keep my promises and agreements under this Security Instrument.

If there is a judgment for Lender in a lawsuit for foreclosure and sale, I will pay to Lender reasonable rent from the date the judgment is entered for as long as I occupy the Property. However, this does not give me the right to occupy the Property.

All rental payments collected by Lender or by a receiver, other than the rent paid by me under this Paragraph, will be used first to pay the costs of collecting rental payments and of managing the Property. If any part of the rental payments remains after those costs have been paid in full, the remaining part will be used to reduce the Sums Secured. The costs of managing the Property may include the receiver's fees, reasonable attorneys` fees and the cost of any necessary bonds.

If I fail to make my payments or keep promises under this Mortgage or the Note, then I shall pay monthly in advance to you or any Receiver a fair charge for the use of the Property that I occupy. If I do not pay this fair charge, you or the Receiver may sue to collect it or to remove me, or both.

I will not collect more than one (1) month's rent in advance from any tenant or occupant without your written consent.

**42. STATEMENT OF AMOUNT DUE AND OF NO DEFENSE**

Within ten days after request, I will give the Lender a signed written statement, acknowledged before a notary indicating the amount due under the Note and the Mortgage and stating whether I have any claims or defenses which would offset or reduce this amount.

**43. LATE CHARGE FOR OVERDUE PAYMENT**

If the Lender has not received the full amount of my monthly payments by the end of fifteen calendar days after the date it is due, I will pay late charges to the Lender. The amount of the charge will be 2.000% of my overdue payment for each month it is overdue, or such rate as may be legally imposed at the time of imposition.

**44. ADDITIONAL CHARGES**

Paragraph 23 of the Mortgage is changed to read as follows:

"I agree to pay all reasonable charges in connection with the servicing of this loan or charges or fees for the prepayment or recording of documents including but not limited to obtaining tax searches and bills, onetime tax service charge, and in processing insurance loss

(Rider – page 4 of 6)

payments, returned checks, ownership transfers, releases, easements, consents, extensions, modifications, special agreements, assignments, reduction certificates and satisfaction of mortgage."

### 45. CHANGE IN LAW

If any law is passed which changes or effects the taxation of mortgages or mortgage debts or the collection of such taxes, then you may request that I pay you all the moneys I owe. If requested by you, I agree to pay all the moneys I owe you under the Note and this Mortgage within thirty (30) days after you give me notice of the passage of such a law.

### 46. VIOLATIONS AFFECTING PROPERTY

If I receive notice from you or any governmental body that the Property or my use, occupation or maintenance of that Property, violates any law or governmental regulation, then I agree to correct such violation within ninety (90) days.

### 47. FAILURE OF VETERANS ADMINISTRATION TO ISSUE GUARANTEE

If this is a VA loan, the principal plus interest is required to be guaranteed by the United States of America, Veterans Administration. If the principal and interest are not guaranteed by the Veterans Administration as required; Lender shall have the right to give the Borrower a 30-day written notice demanding immediate payment in full. If such notice is given, the entire amount remaining unpaid under the Note and under the Mortgage are to be paid at the expiration of the 30-day period.

### 48. LENDER'S RIGHT TO COMMINGLE FUNDS

Paragraph 3A of the Mortgage obligates me to make monthly payments to the Lender for taxes, insurance, assessments, ground rents, sewer rents and water charges, and hazard, flood, and mortgage insurance, if any. I understand the Lender will not hold these funds separate and apart from any other funds that it has and that the Lender will not hold these funds in trust for me for any reason.

### 49. PROHIBITION AGAINST OTHER BORROWING USING PROPERTY AS SECURITY

I understand the Lender will not allow me to borrow any other funds from any other party if I use the Property as security for the loan. If I do so without the prior written consent of the Lender, the Lender shall be entitled to give me 30-days' notice demanding immediate payment in full. If such notice is given, the entire amount remaining unpaid under the Note and under the Mortgage is to be paid at the expiration of the 30-day period.

### 50. CHANGING THIS MORTGAGE

Except as described in Paragraph 56, this Mortgage may be changed only if you and I both give our written consent.

### 51. CHANGE IN OWNERSHIP OF PROPERTY, NOTE OR MORTGAGE

Personal representatives and anyone to whom the Property under this Mortgage is transferred shall be bound by and shall have the benefit of all of the terms of the Note and this Mortgage. If the Note and/or this Mortgage are transferred to someone else, that holder shall be bound by and shall have the benefit of all of the terms of the Note and this Mortgage, except as described in Paragraph 56.

### 52. PURCHASE MONEY MORTGAGE

This is a Purchase Money Mortgage, which means that a portion of the loan proceeds was used to pay for the purchase of the Property.

## 53. ADDITIONAL SECURITY FOR LOAN

To protect the Lender in the event of a default of any terms of this Mortgage or the Note it secures, I hereby give to the Lender a security interest in my savings and/or checking account or other property of mine coming into the Lender's possession (other than my IRA or KEOGH accounts). Lender can apply this property against what I owe it.

## 54. OTHER AGREEMENTS WITH LENDER

I will be in default and the Lender can require that I immediately pay the entire unpaid principal balance of the loan and interest owed with notice or demand to me if I break any agreement or promise I have made in any other agreement with the Bank.

## 55. USE OF PREMISES

I agree to not use the premises for drug-related, gambling-related or other unlawful activity.

## 56. RIDER VOID IF MORTGAGE SOLD TO FNMA, GNMA, FHLMC OR FHLP OF NEW YORK

If the Federal National Mortgage Association (FNMA), Government National Mortgage Association (GNMA), the Federal Home Loan Mortgage Corporation (FHLMC) or Federal Home Loan Bank of New York (FHLB of New York) buys all or some of the Lender's rights under the Mortgage and the Note, or, in any other event, if the Noteholder in writing so elects, the promises and agreements in this Rider will no longer have any force or effect.

This Rider is a part of the attached Mortgage and by signing below, I agree to all of the above.


DAVID DEPIETTO - Borrower


- - Borrower

(Rider - page 6 of 6)

# FIXED/ADJUSTABLE RATE RIDER

### (One-Year Treasury Index–Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this <u>27th day of June, 2007,</u> and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to <u>RIDGEWOOD SAVINGS BANK,</u> ("Lender") of the same date and covering the property described in the Security Instrument and located at:

<u>22 WALBROOKE ROAD, SCARSDALE, NEW YORK 10583</u>
[Property Address]

THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial fixed interest rate of <u>5.875%</u>. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

### 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES
#### (A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of <u>JULY, 2012,</u> and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

#### (B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

#### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding <u>TWO AND SEVEN EIGHTHS</u> percentage points (<u>2.8750%</u>) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **7.875%** or less than **3.875%**. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than **11.875%**.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

> **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

> If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**BY SIGNING BELOW,** Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)
DAVID DEPIETTO - Borrower

_____ (Seal)
- - Borrower

MULTISTATE FIXED/ADJUSTABLE RATE RIDER—ONE-YEAR TREASURY INDEX—Single Family—Fannie Mae Uniform Instrument Form 3182 1/01
*(Page 3 of 3)*

## RIDER TO FIXED/ADJUSTABLE RATE RIDER

I further promise and agree with Lender as follows:

C.   SECTION C IS ADDED TO THE FIXED/ADJUSTABLE RATE RIDER AS FOLLOWS:

If the terms of my loan provide that the initial fixed interest rate on my loan shall remain fixed for a period of at least five years, then Section C. is added to the Fixed/Adjustable Rate Rider to read as follows:

C.   The Note provides for the Borrower's right to prepay, as follows:

"5.   BORROWER'S RIGHT TO PREPAY.

If I make a partial or full prepayment within one (1) year from the date of this Note, there will be a penalty of three months' interest on the amount of my advance payment.   If I make a partial or full prepayment after one (1) year from the date of this Note, there will not be any penalty.   Advance payments which do not fully pay the amount owed on this Note will not be credited against the amount owed until the first day of the calendar month following the date of advance payment.   I shall not be entitled to receive interest on any funds while being held by Lender prior to crediting same nor shall I be entitled to any interest on the amount prepaid.

When I make a prepayment, I will tell the Note Holder in writing that I am doing so.   The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note.   If I make a partial prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.   My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment.   However, any reduction due to my partial prepayment may be offset by an interest rate increase."

D.   ABOVE CHANGES VOID IF NOTE IS SOLD TO FNMA, GNMA, FHLMC OR FHLB OF NEW YORK

If the Federal National Mortgage Association (FNMA), Government National Mortgage Association (GNMA), the Federal Home Loan Mortgage Corporation (FHLMC) or Federal Home Loan Bank of New York (FHLB of New York) buys all or some of the Lender's rights under the Note and the Mortgage it secures, or, in any other event, if the Note Holder in writing so elects, the promises and agreements in this Rider will no longer have any force or effect.

_____
DAVID DEPIETTO - Borrower

_____
- - Borrower

Schedule A Description

All that certain piece or parcel of land with the buildings and improvements thereon erected, situate, lying and being in the Town of Greenburgh, County of Westchester and State of New York known as Lot 1 as shown on a certain filed map entitled "Re-Subdivision Map of Part of Lots 20, 22, 113 and 115 Map of Edgemont, Town of Greenburgh, Westchester County, New York". Said map prepared by the Office of Paul J. Perretti, Civil Engineer & Land Surveyor, Dobbs Ferry, New York and filed in the Westchester County Clerk's Office, Division of Land Records as Map No. 25361 on January 19, 1995. Being more particularly bounded and described as follows:

BEGINNING at a point on the northwesterly line of Edgemont Road at the intersection of the southwesterly line of Lot No.1 with the aforementioned northwesterly line of Edgemont Road as shown on the aforesaid Map No. 25361 said point and place of beginning being distant 62.517 feet northerly from the end of a curve and point of tangency on the southeasterly line of Lot 113, which said end of curve and point of tangency is marked by a stone monument set 30 feet opposite on a radial line to the aforementioned end of a curve as shown on a certain filed map entitled "Map of Edgemont, The Property of the Scarsdale - Edgemont Corporation at Scarsdale, in the Town of Greenburgh, Westchester County, N.Y.". Said map being filed as Map No. 2153 in the Westchester County Clerk's Office, Division of Land Records on May 3, 1917.

THENCE from said point and place of beginning the following courses and distances: North 59 degrees 26 minutes 17 seconds, West 131.86 feet along the distance line between Lot No. 1 and Lot No. 2 as shown on the aforesaid Map No. 25361 to a point on the southeasterly line of Walbrooke Road as shown on the aforesaid Maps 2153 and 25361; and

THENCE northeasterly along the southeasterly line of Walbrooke Road along a curve to the left with a radius of 1741.13 feet a distance of 65.105 feet to a point at the intersection of the northerly line of Lot No. 1 as shown on the aforesaid Map No. 25361; and

THENCE southeasterly along the northeasterly line of Lot No. 1 South 59 degrees 33 minutes 22 seconds East a distance of 141.73 feet to a point on the northwesterly line of Edgemont Road; and

THENCE southwesterly along the northwesterly line of Edgemont Road along a curve to the left with a radius of 7035.00 feet a distance of 65.00 to the point and place of beginning of the premises described herein.

# EXHIBIT B

BRONSON LAW OFFFICES, P.C.
Counsel for the Debtor and Debtor in Possession
480 Mamaroneck Ave.
Harrison, NY 10528
(914) 269-2530
H. Bruce Bronson, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
In re:

                                      Case No.:19-22590 (RDD)
                                      Chapter 11

DAVID DEPIETTO,

                        Debtor.

-----------------------------------------------------------------X

## AMENDED PLAN OF REORGANIZATION

DAVID DEPIETTO, debtor and debtor-in-possession (the "**Debtor**") proposes the

following Chapter 11 Amended Plan of Reorganization (the "**Amended Plan**") pursuant to Title

11 of the United States Code:

## ARTICLE 1

## DEFINITIONS

For the purposes of this Amended Plan, and the Amended Disclosure Statement

simultaneously filed by the Debtor, the following terms shall have the respective meanings set

forth below (such meanings to be equally applicable to the singular and plural forms of the terms

defined, unless the context otherwise requires):

1. "**Administrative Expense Claim**" means a Claim for the costs and expenses of

   administering this Chapter 11 case allowed under Sections 503(b) or 330(a) of the

   Bankruptcy Code and that are entitled to priority under Section 507(a)(2) of the

   Bankruptcy Code, including compensation for all professional services and

   reimbursement of expenses awarded by the Bankruptcy Court.

2.  "**Allowed Claim**" means (1) a Claim timely filed before the Bar Date and (a) as to which no objection has been filed within the time fixed in the Amended Plan or (b) as to which any objection that is filed has been subsequently settled, waived, withdrawn or denied by the Bankruptcy Court, (2) a Claim listed on the Bankruptcy Schedules and not designated as contingent, unliquidated or disputed, or (3) a Claim allowed pursuant to an order of the Bankruptcy Court.

3.  "**Amended Plan**" means this Chapter 11 plan of reorganization as amended and filed by the Debtor.

4.  "**Ballot(s)**" means the document by which Impaired classes of creditors will vote to either accept or reject the Plan.

5.  "**Bankruptcy Code**" or "**Code**" means the Bankruptcy Code, Title 11 U.S.C. Section 101 et. seq. as amended from time to time and applicable to this case.

6.  "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York or any other court exercising jurisdiction in this case.

7.  "**Bankruptcy Schedules**" means the schedules of assets and liabilities, lists and statements of financial affairs, together with all amendments thereto, filed by the Debtor pursuant to Bankruptcy Rule 1007.

8.  "**Bar Date**" means June 9, 2020, at 5:00 p.m., the deadline by which proofs of Claim are required to be filed with the Clerk of the Bankruptcy Court in this case, with the exception of the Claims of governmental units.

9.  "**Cash**" means cash or cash equivalent (a) of the Reorganized Debtor on hand as of the Effective Date and/or(b) realized from the Debtor's or Reorganized Debtor's business operations or employment following the Effective Date.

10. "**Claim**" means a right to payment as set forth in Section 101(5) of the Bankruptcy

Code.

11. "**Claimant**" means the holder of a Claim.

12. "**Confirmation**" means approval of this Amended Plan by the Confirmation Order of the Bankruptcy Court following a hearing and notice thereof in accordance with the Bankruptcy Code and Bankruptcy Rules.

13. "**Confirmation Date**" shall mean the date of entry of the Confirmation Order.

14. "**Confirmation Hearing Date**" shall mean the date set by the Bankruptcy Court for the hearing on confirmation of the Amended Plan.

15. "**Confirmation Order**" means the order of the Bankruptcy Court pursuant to Section 1129 of the Bankruptcy Code confirming the Amended Plan.

16. "**Debtor**" means the individual David DePietto.

17. "**Debtor-in-Possession Account**" or "**DIP Account**" means the bank account(s) the Debtor established pursuant to U.S. Trustee guidelines shortly after filing for bankruptcy.

18. "**Disputed Claim**" means:

    (a) any Claim that is listed in the Debtor's Bankruptcy Schedules as being disputed, contingent or unliquidated with respect to which no Proof of Claim has been timely filed; and

    (b) any filed Claim with respect to which an objection to the allowance thereof, in whole or in part, has been interposed within the applicable period fixed by the Bankruptcy Court and such Claim has not become an Allowed Claim.

19. "**Effective Date**" means the date upon which the Confirmation Order becomes a Final Order.

20. "**Final Order**" means an order of the Bankruptcy Court which has not been reversed,

stayed, modified or amended and as to which (a) any right to appeal or seek certiorari, review or rehearing has been waived or (b) the time to appeal or seek certiorari, review or rehearing has expired and as to which no appeal or petition for certiorari, review or rehearing is pending.

21. "**Government Bar Date**" means the deadline by which governmental units have to file a proof of claim with the clerk of the Court in this case, which was June 9, 2020 at 5:00 p.m.

22. "**Impaired**" means impairment of a class of Claims under Section 1124 of the Bankruptcy Code.

23. "**Petition Date**" means March 8, 2019, the date on which the Debtor filed his voluntary Chapter 11 petition.

24. "**Plan**" means the same as "Amended Plan", this Chapter 11 plan of reorganization as amended and filed by the Debtor.

25. "**Priority Claim**" means all Claims that are entitled to priority pursuant to Bankruptcy Code Section 507(a), with the exception of Administrative Expense Claims.

26. "**Priority Tax Claim**" means all Claims that are entitled to priority pursuant to Bankruptcy Code Sections 502(i) and 507(a)(8).

27. "**Pro Rata**" means with respect to a class member, in the same proportion as the amount of such member's Allowed Claim over the total Allowed Claims in such class.

28. "**Provisional Ballots**" means Ballots sent to the class 2 secured creditors by which they can vote to accept or reject the Amended Plan, subject to the Court determining whether or not they are Impaired.

29. "**Reorganized Debtor**" means the Debtor after the Effective Date.

30. "**Secured Claim**" means a Claim secured by a lien, judgment lien, mortgage or

security interest on property of the Debtor's estate to the extent of the value of the

property of the Debtor's estate securing such Claim, and any valid and enforceable

right of setoff.

31. "**Secured Creditor**" means the holder of an Allowed Secured Claim.

32. "**Unsecured Claim**" means a Claim that is not a Secured Claim, Administrative

Expense Claim, Priority Claim, or Priority Tax Claim.

33. "**Unsecured Creditor**" means the holder of an Allowed Unsecured Claim.

34. "**U.S. Trustee Fees**" means all fees payable pursuant to 28 U.S.C. § 1930, and

statutory interest thereon.

All rules of construction contained in Section 102 of the Bankruptcy Code apply in the

construction of the Amended Plan.

## ARTICLE 2

### UNCLASSIFIED ADMINISTRATIVE EXPENSE CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS

Pursuant to Section 1123(a)(1) of the Bankruptcy Code, the Amended Plan does

not classify Administrative Expense Claims and Priority Tax Claims, which shall be afforded the

following treatment:

1. **Administrative Expense Claims**. All Allowed Administrative Expense Claims shall

be paid in full in Cash on the later of the Effective Date and entry of an order of the

Bankruptcy Court allowing the same, unless otherwise agreed upon by the parties. The

primary Administrative Expense Claims consist of fees approved by the Court that are

payable to bankruptcy counsel and post-Petition Date taxes.

2. **Priority Tax Claims**. Allowed Priority Tax Claims shall be paid in full in Cash on the

Effective Date of the Amended Chapter 11 Plan. Allowed Priority Tax Claims shall be

paid in full in Cash on the Effective Date of the Amended Chapter 11 Plan as provided

in their respective proofs of claim. The Internal Revenue Service ("IRS") has filed a

Priority Tax Claim in the amount of $23.00, for periods through 2016, which will be

paid in full, on the Effective Date. The New York State tax for Allowed Priority

Claims, for periods through 2018, in the amount of $504 will be paid in Cash on the

Effective Date, in full.

| Claimant | Total Allowed Priority Tax Claim | Payment (including interest) |
|---|---|---|
| IRS (POC 3-2) | $ 23 | $23 (One-time Payment on the effective date) |
| NYS Dept. of Tax (POC 1-2) | $504 | $504 One-time Payment on the effective date) |

3.   **U.S. Trustee Fees**. Any unpaid U.S. Trustee Fees shall be paid in Cash on the

Effective Date.

## ARTICLE 3

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

1.      **Class 1-Allowed Priority Claims.** Class 1 consists of all Allowed Priority Claims,

other than Priority Tax Claims.

**Treatment-** The Allowed Priority Claims, if any, shall be paid in full in Cash on the

Effective Date.

**Right to Vote.** Class 1 is not Impaired under the Amended Plan and therefore is not

entitled to vote to accept or reject the Amended Plan.

2.      **Class 2-Allowed Secured Claims.** Class 2 consists of all Allowed Secured Claims

and is broken into two sub-classes: 2A and 2B.

A. Class 2A consists of the following Allowed Secured Claims secured by the Debtor's

residence: Ridgewood Savings Bank in the Allowed Amount of $501,493.29 (first mortgage on residence). Debtor will pay this Allowed Secured Claim at the contract rate of $6,397 (or such amount as adjusted from time to time based upon interest fluctuations) monthly. Arrears of $474,367 will be paid over seventeen (17) years at the rate of $2,326 per month; provided that on the maturity date of the Citibank loan and mortgage, the balance of any arrears will be paid in full.

B. Class 2B consists of the Allowed Secured Claims secured by tax liens against the Debtor's property: Internal Revenue Service in the Allowed amount of $116,911 and New York State in the Allowed Amount of $1,035. The Debtor will pay New York State in full within ninety (90) days of the Effective Date. The Debtor will pay the Internal Revenue Service claim $2,750 a months over a period of forty-five (45) months at the applicable statutory rate of interest.

**Right to Vote.** Class 2A is not Impaired under the Amended Plan and is not entitled to vote to accept or reject the Amended Plan, as such Claim will be paid, at the contract rate with all arrears are being paid over 17 years pursuant to the Plan. Class 2B is also not Impaired under the Amended Plan and is not entitled to vote to accept or reject the Amended Plan, as such Claim will be paid, within ninety days from the Effective date or over a period of forty-five (45) months at the statutory rate of interest pursuant to the Amended Plan. Provisional Ballots are being provided to the Class 2A and Class 2B creditors so that they can vote subject to the Court determining whether or not they are Impaired.

**Retention of Lien.** Notwithstanding anything set forth herein to the contrary, the creditors holding Allowed Secured Claims shall retain their liens.

3.        **Class 3-Allowed Unsecured Claims.** Class 3 Allowed Unsecured Claims consist of the following, subject to reduction by objection of the Debtor or on agreement of the parties within 90 days of the effective date:

| Claimant | POC/Petition | Claim Amount Allowed | Amount to be Paid | Monthly Payment |
|---|---|---|---|---|
| Citibank, N.A.<br>P.O. Box 6030<br>Sioux Falls, SD 571117-6030 | POC 2-1 | **$89,993** | $30,000 | $500 |
| Ira A. Gorsky<br>121 Highland Ridge Rd.<br>Manalapan, NJ 07726-8641 | Petition 4.1 | **$6,717** | $1,500 | $25 |

**Treatment-**The Class 3 Allowed Unsecured Claims will be paid their pro-rata share of $525 per month for 60 months from the Effective Date. The Debtor may pre-pay the total amounts set forth herein at any time without penalty or notice.

Citibank, N.A. ("Citibank") has filed its allowed claim as unsecured and as such, is classified by as an Allowed Unsecured Claim.

**Removal of Lien.** To the extent Citibank has a lien on the Debtor's property such lien is hereby void subject to completion of the Amended Plan, pursuant to Sections 506(d) and 1141(c) of the Bankruptcy Code. Upon the payment of its pro rata distribution as set forth herein, Citibank will file the necessary documents with the Clerk of Westchester County causing its lien to be removed from the property records. In the event that Citibank does not file the appropriate documentation with the Clerk of Westchester County to remove the lien, the Debtor is hereby expressly authorized to do so.

**Right to Vote.** Class 3 is Impaired and entitled to vote to accept or reject the Amended Plan. To the extent there are any holders of claims that were listed in the Schedules as disputed that have failed to file a proof of claim, they will not be entitled to a distribution and are not included herein. Unless otherwise ordered by the Bankruptcy Court for cause, only the Debtor shall have standing to file and prosecute objections to Claims. All such objections shall be filed and served no later than 90 days after the Effective Date in accordance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

**ARTICLE 4**

-8-

## IMPLEMENTATION OF THE AMENDED PLAN

Payments to holders of Allowed Claims under the Amended Plan will be made by the Debtor/Reorganized Debtor from (a) Cash on hand as of the Effective Date, and (b) Cash realized from the Debtor's/Reorganized Debtor's earnings following the Effective Date.

Professional fees for services rendered and expenses incurred by the Debtor's attorneys subsequent to the Effective Date in connection with the Amended Plan or the Debtor's/Reorganized Debtor's chapter 11 case, may be paid by the Debtor without prior court approval, to the extent that Section 1123(a)(6) of the Bankruptcy Code is applicable.

The Amended Plan may be altered, amended or modified by the Debtor at any time before the substantial consummation of the Amended Plan, as provided in Sections 1101(a) and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, which authorizes the proponent of a plan of reorganization to modify such plan at any time prior to confirmation of the plan so long as the plan, as modified, continues to meet certain requirements therein.

## ARTICLE 5

## PROVISIONS GOVERNING DISTRIBUTIONS

**1. Disbursements.** All distributions under the Amended Plan shall be made by the Debtor/Reorganized Debtor as provided in Article 3 hereof. Payments to be made monthly under the Plan will be made in Cash on or about the first of each month.

**2. Rights and Powers of the Debtor.** The Debtor/Reorganized Debtor shall be empowered to (i) execute all agreements, instruments and other documents necessary to perform their duties under the Amended Plan, (ii) make all distributions contemplated by the Amended Plan, (iii) prosecute, settle and enforce any objections to Claims or other preserved causes of action on behalf of the Debtor's estate as set forth in the Amended Plan, and (iv) exercise such

other powers as may be deemed necessary and proper to implement the Amended Plan.

**3. Claim Objection Deadline.** Unless otherwise ordered by the Bankruptcy Court for cause, after the Effective Date only the Debtor shall have standing to file and prosecute objections to Claims. All such objections shall be filed and served no later than 90 days after the Effective Date in accordance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

**4. No Distribution Pending Allowance.** Notwithstanding any other provision of the Amended Plan, no payment or distribution shall be made with respect to any portion of a Disputed Claim under the Amended Plan unless and until such Disputed Claim becomes an Allowed Claim. Instead, any monies that otherwise would be paid if a Disputed Claim were Allowed shall be retained by the Debtor/Reorganized Debtor until such time as the Claim is finally Allowed, at which time such withheld Cash shall be paid to the holder of such Allowed Claim or, to the extent that such Disputed Claim is not Allowed, Pro Rata to the holders of Allowed Class 3 Unsecured Claims.

**5. Undeliverable Distributions.** If a distribution to the holder of any Allowed Claim is returned as undeliverable, no further distribution hereunder shall be made to such Claimant unless such Claimant notifies the Debtor in writing of its correct address within 180 days after the date of such distribution. Any undeliverable distribution shall be distributed Pro Rata to the remaining holders of Allowed Class 3 Claims. Debtor shall make reasonable efforts to locate holders of Allowed Claims.

## ARTICLE 6

## <u>TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>

**Executory Contracts and Unexpired Leases.** To the extent the Debtor is a party to an executory contract or unexpired lease which has not otherwise been assumed or rejected prior to the Effective Date under Section 365 of the Bankruptcy Code, the Confirmation Order shall

constitute an Order authorizing the assumption of such Executory Contract or unexpired lease

pursuant to Sections 365 and 1123 of the Bankruptcy Code. In the event any lease or executory

contract is to be assumed that is not paid currently, the Debtor will, as a condition of assumption,

cure the default by making payment of the amounts owed. Any party objecting to the assumption

or cure amount shall have until ten days prior to the Confirmation Hearing date to oppose such

assumption or cure amount. The Debtor is not aware of any executory contracts or unexpired

leases and accordingly believes that he owes no cure amounts under Section 365 of the

Bankruptcy Code.

**This paragraph constitutes notice to any party having an executory contract or
unexpired lease with Debtor, that Debtor will pay no cure amounts unless (a) the non-debtor
party files and serves a statement setting forth the cure amount and objecting to the
Amended Plan on or before the date to object to Confirmation of the Amended Plan or (b)
the Court awards such cure amount.**

### ARTICLE 7

### MISCELLANEOUS PROVISIONS

1. **Orders in Aid of Consummation.** Pursuant to Sections 105, 1141, 1142 and 1143 of

the Bankruptcy Code, the Bankruptcy Court may enter one or more orders in aid of

implementation of the Amended Plan.

2. **Compliance with Tax Requirements.** In connection with the Amended Plan, the

Debtor/Reorganized Debtor shall comply with all withholding and reporting requirements

imposed by federal, state, and local taxing authorities, and distributions under the Amended Plan

shall be subject to such withholding and reporting requirements.

3. **Due Authorization by Creditors.** Each and every holder of an Allowed Claim who

accepts a distribution provided for under the Amended Plan warrants that it is the lawful owner of

such Claim and is authorized to accept the distribution provided for in the Amended Plan on account of such Claim and that there are no outstanding liens, encumbrances, commitments, agreements, or understandings, express or implied that may or can in any way defeat or modify the rights released, conveyed or modified by the Amended Plan, or obligations undertaken by such creditor under the Amended Plan.

**4. Filing of Additional Documents**. Except as otherwise provided in the Amended Plan, on or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Amended Plan.

**5. Section Headings.** The section headings contained in the Amended Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Amended Plan.

**6. Computation of Time.** In computing any period of time prescribed or allowed by the Amended Plan, the provision of Bankruptcy Rule 9006(a) shall apply.

**7. Successors and Assigns.** The rights, benefits and obligations of any entity named or referred to in the Amended Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or permitted assign of such entity.

**8. Notices.** All notices and other communications to be given or made hereunder shall be in writing and shall be deemed to have been given or made when mailed or as otherwise set forth herein:

(a) to the Debtor/Reorganized Debtor at: Bronson Law Offices, P.C., 480 Mamaroneck Avenue, Harrison, NY 10528, Attention H. Bruce Bronson, Esq.;

(b) if to any Claimant at (i) the address set forth on the respective proofs of Claim filed by such Claimants; (ii) the addresses set forth in any written notices of address changes delivered to

the Debtor/Reorganized Debtor after the Effective Date; or (iii) the address reflected in the

Bankruptcy Schedules if no proof of Claim is filed and the Debtor has not received a written

notice of a change of address; and

(c)  if to any entity that has filed a notice of appearance, at the address(es) set forth on

such notice of appearance.

**9. Governing Law.** The rights and obligations arising under the Amended Plan shall be

governed by, and construed and enforced in accordance with, the Bankruptcy Code and

Bankruptcy Rules and the laws of the State of New York, as applicable.

**10. Other actions.** Nothing contained herein shall prevent the Debtor from taking such

action as may be reasonably necessary to carry out this Amended Plan, although such actions may

not specifically be provided for within the Amended Plan.

**11. Severability.** In the event any provision of the Amended Plan is determined to be

unenforceable such determination shall in no way limit or affect the enforceability and operative

effect of any or all other provisions of the Plan.

**12. Causes of Action.** The Debtor is not aware of any causes of action that his bankruptcy

estate may have, including actions under Chapter 5 of the Bankruptcy Code. Nevertheless, he

fully reserves his right to pursue any causes of action post-confirmation, and any setoff rights

arising thereunder.

**ARTICLE 8**

**<u>DISCHARGE OF DEBTS</u>**

Confirmation of the Amended Plan does not discharge any debt provided for in the

Amended Plan until the Bankruptcy Court grants a discharge on completion of all payments under

the Amended Plan, or as otherwise provided in Section 1141(d)(5) of the Bankruptcy Code. The

Debtor will not be discharged from any debt excepted from discharge under Section 523 of the

Bankruptcy Code, except as provided in Rule 4007 of the Federal Rules of Bankruptcy Procedure.

## ARTICLE 9

## <u>LIMITATION OF LIABILITY; INJUNCTION</u>

To the extent permitted by Section 1125(e) of the Bankruptcy Code, upon the Effective

Date, neither the Debtor nor his counsel or agents shall have incurred or shall incur any liability to

any holder of a Claim or any other person or entity for any act or omission in connection with, or

arising out of, the Amended Disclosure Statement, the pursuit of approval of the Amended

Disclosure Statement, the pursuit of Confirmation of the Amended Plan, the consummation of the

Amended Plan or the administration of the Amended Plan or the property to be distributed under

the Amended Plan, except for willful misconduct, gross negligence, self-dealing or breach of

fiduciary duty. Nothing herein shall abrogate applicable disciplinary rules.

At the Confirmation Hearing, the Debtor will be seeking an injunction as of the Effective

Date protecting the Debtor/Reorganized Debtor and his estate and assets, except as provided in

the Amended Plan, until the entry of an order by the Bankruptcy Court granting the Debtor a

discharge upon performance of all their duties and obligations under the Amended Plan. The

injunction will be sought because under the Bankruptcy Code [11 U.S.C. §1141(d)(5)] where, as

here, the debtors in a chapter 11 case are individuals, confirmation of the Amended Plan does not

discharge any debt provided for in the plan until the Bankruptcy Court grants a discharge upon

completion of all payments under the plan. Therefore, at the Confirmation Hearing, the Debtor

will request the Bankruptcy Court to enter a Confirmation Order providing that, as of the

Effective Date, as to every holder of a debt or Claim against the Debtor, such holder shall be

enjoined from interfering with the Debtor's/Reorganized Debtor's ability to carry out the terms of

the Plan or enforcing any remedy against the Debtor or his estate or property with respect to any

Claim. The order will further provide that in the event of a default by the Debtor/Post-

Confirmation Debtor under the Amended Plan, a Claimant may make an appropriate application

to the Bankruptcy Court seeking relief from such injunction.

## ARTICLE 10

## **RETENTION OF JURISDICTION**

After the entry of the Confirmation Order, the Bankruptcy Court shall retain jurisdiction

until this Chapter 11 bankruptcy case is closed to perform the following actions:

(a) Ensure that the Amended Plan is fully consummated;

(b) Resolve all matters arising under or relating to the Plan, including, without

limitation, its enforcement and interpretation;

(c) Allow, disallow, determine, liquidate or classify, any Claims;

(d) Grant or deny all applications for allowance of compensation and

reimbursement of expenses by the professionals retained in this bankruptcy case;

(e) Resolve any motions or applications still pending prior to the Effective Date;

(f) Enter such orders as may be necessary or appropriate to implement or

consummate the  Amended Plan and all contracts, deeds, instruments made or created in

furtherance of the Amended Plan or to enforce all orders, judgments and rulings entered in

connection with this bankruptcy case, including an order granting the Debtor's discharge upon

certification of the completion of all distributions under the Amended Plan; and

(g) Enter a discharge order and Final Decree concluding this bankruptcy case.

## ARTICLE 11

## **CLOSING THE CASE**

**1. Bankruptcy Fees.** All fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 and any applicable interest pursuant to 31 U.S.C. § 3717, shall be paid through the entry of a Final Decree, or conversion or dismissal of the Debtor's Chapter 11 case, whichever is earlier.

**2. Post-Confirmation Reports.** After Confirmation, the Debtor shall file quarterly status reports regarding the implementation of the Amended Plan and schedule such status conferences as may be necessary until the case is closed.

**3. Closing the Case.**  Within 14 days following the full administration of the Debtor's estate, the Debtor shall file, on notice to the United States Trustee, an application and a proposed order for a Final Decree pursuant to Bankruptcy Rule 3022. The Debtor may close the case after the Effective Date and reopen the case when their estate is fully administered in accordance with this Plan, in order to obtain a discharge.

**DATED:**     Harrison, New York
             July 8, 2020

*/s/David DePietto*
David DePietto

                              BRONSON LAW OFFICES, P.C.

                    By:    */s/ H. Bruce Bronson*
                           H. Bruce Bronson
                           Bankruptcy Counsel to the
                           Debtor and Debtor-in-Possession

# EXHIBIT C

**THIS IS A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE CHAPTER 11 PLAN OF REORGANIZATION. THIS DISCLOSURE STATEMENT HAS BEEN CONDITIONALLY APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR FINAL APPROVAL.**

BRONSON LAW OFFFICES, P.C.
Counsel for the Debtor
480 Mamaroneck Ave.
Harrison, NY 10528
(914) 269-2530
H. Bruce Bronson, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
In re:

Case No.:19-22590 (RDD)
Chapter 11

DAVID DEPIETTO,

Debtor.

----------------------------------------------------------------X

<u>**AMENDED DISCLOSURE STATEMENT**</u>

DAVID DEPIETTO, debtor and debtor-in-possession (the "**Debtor**") submits this AMENDED Disclosure Statement (the "**Disclosure Statement**"), pursuant to Section 1125 of Title 11 of the United States Code (the "**Bankruptcy Code**" or "**Code**"), in connection with his request for confirmation of the Debtor's accompanying Amended Plan of Reorganization of even date (the "**Amended Plan**"). Unless otherwise defined, all capitalized terms contained in the Plan shall have the same meaning for purposes of this Disclosure Statement. The Amended Plan has been filed with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") and is attached hereto as "**Exhibit A**". By Order of the Bankruptcy Court, the Bankruptcy Court provisionally and conditionally approved this Disclosure Statement as containing "adequate information" of a kind, and in sufficient detail, to enable a hypothetical reasonable investor typical of the Debtor's creditors to make an informed decision whether to

accept or reject the Amended Plan. The order also schedules a combined hearing on the Debtor's

request for final approval of the Disclosure Statement and confirmation of the Amended Plan and

the date to object to such relief. A copy of such order is provided to you with this Disclosure

Statement.

Accompanying this Disclosure Statement are copies of the following documents

("**Exhibits A, B, C, D and E**"):

A. **The Amended Plan;**
B. **Valuation of Debtor's Residential Property, First and Second Mortgages' Proof of Claims;**
C. **Current Balance Sheet and Liquidation Analysis of the Debtor;**
D. **Financial Projections of the Debtor; and**
E. **Ballot or Provisional Ballot for voting to accept or reject the Plan.**

## AMENDED PLAN SUMMARY

The Amended Plan is designed as a mechanism for the financial reorganization of Debtor.

The Debtor David DePietto is self-employed. The Debtor will make payments to the holders of

Allowed Claims in the classes set forth herein.  Pursuant to the Amended Plan, there will be three

Classes of creditors as follows:

**Class 1**: consists of all Allowed Priority Claims except Priority Tax Claims.

**Class 2**: consists of all Allowed Secured Claims

**Class 3**: consists of all Allowed Unsecured Claims.

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense

Claims and Priority Tax Claims have not been classified and thus are excluded from the foregoing

classes.

## THE CONFIRMATION PROCESS

### The Confirmation Hearing

Pursuant to Section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a

hearing to consider final approval of the Amended Disclosure Statement and confirmation of the

Amended Plan on August 24, 2020  at 10:00 a.m., prevailing New York time (the "**Confirmation**

**Hearing Date**"), before the Honorable Robert D. Drain at 300 Quarropas Street, White Plains,

New York 10601. The Bankruptcy Court has directed that objections, if any, to final approval of

the Amended Disclosure Statement and/or confirmation of the Amended Plan be filed and served

**so as to be received** on or before July 24, 2020, in the manner described below under

"Requirements for Confirmation."

At the Confirmation Hearing, the Bankruptcy Court will determine whether the

Disclosure Statement should be approved on a final basis and whether the confirmation

requirements of the Bankruptcy Code have been satisfied. This includes whether this Disclosure

Statement shall be approved on a final basis as containing adequate information under Section

1125 of the Code. The Debtor believes that the Amended Plan satisfies all applicable

requirements of Section 1129(a) of the Bankruptcy Code.

### The Purpose of this Disclosure Statement

This Disclosure Statement and the accompanying Ballot are being furnished to the

Debtor's known creditors pursuant to Section 1125(b) of the Bankruptcy Code in connection with

a solicitation of acceptances of the Chapter 11 Plan from those entitled to vote on the Plan. The

Plan is incorporated herein by reference. You should read this Disclosure Statement and the Plan

carefully. In any conflict between the Plan and this Disclosure Statement, the Plan will control.

**Disclaimer**

**NO PERSON MAY BE GIVEN ANY INFORMATION OR MAKE ANY REPRESENTATIONS NOT CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITIATON OF ACCEPTANCES OF THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THAT DATE. ALL CREDITORS SHOULD READ CAREFULLY AND CONSIDER FULLY THE DISCLOSURE STATEMENT BEFORE VOTING FOR OR AGAINST THE PLAN.**

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLORSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS THE EQUVIALENT OF A STATEMENT MADE IN FURTHERANCE OF SETTLEMENT NEGOTIATIONS.**

**THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE DEBTOR'S CHAPTER 11 CASE, AND FINANCIAL INFORMATION.**

**ALTHOUGH THE DEBTOR BELIEVES THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED FROM THE DEBTOR'S BOOKS AND RECORDS AND PUBLIC PLEADINGS. ALTHOUGH DILIGENT EFFORTS HAVE BEEN MADE TO PRESENT ACCURATE AND COMPLETE INFORMATION, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION IS WITHOUT SOME INACCURACY OR OMISSION.**

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.**

**THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR. ANY VALUE GIVEN AS TO ASSETS OF THE DEBTOR IS BASED UPON AN ESTIMATION OF SUCH VALUE. YOU ARE URGED TO CONSULT YOUR OWN COUNSEL AND FINANCIAL AND TAX ADVISORS IF YOU HAVE ANY QUESTIONS OR CONCERNS REGARDING TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS.**

**THE DISCLOSURE STATEMENT ORDER, A COPY OF WHICH ACCOMPANIES THIS DISCLSOURE STATEMENT, SPECIFIES THE DEADLINES, PROCEDURES, AND INSTRUCTIONS FOR VOTING TO ACCEPT OR REJECT THE AMENDED PLAN AND FOR FILING OBJECTIONS TO FINAL APPROVAL OF THE DISCLOSURE STATEMENT AND/OR CONFIRMATION OF THE AMENDED PLAN. A FORM BALLOT FOR VOTING ON THE ACCEPTANCE OR REJECTION OF THE AMENDED PLAN IS ALSO PROVIDED HEREIWTH TO EACH HOLDER ENTITLED TO VOTE. EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD READ THE DISCLOSURE STATEMENT, THE AMENDED PLAN AND THE DISCLOSURE STATEMENT ORDER IN THEIR ENTIRETY BEFORE VOTING ON THE AMENDED PLAN.**

### Voting Instructions

The Debtor has sent a Ballot or a Provisional Ballot with voting instructions to all Claimants entitled to vote to accept or reject the Amended Plan (along with the Amended Plan and a copy of this Disclosure Statement, which have also been sent to all other known creditors). Creditors entitled to vote on the Amended Plan should read the Amended Plan and the Ballot carefully before completing, signing, and returning the Ballot to the undersigned counsel so as to be received by the voting deadline.

The Amended Plan can be confirmed by the Bankruptcy Court and thereby made binding on all creditors if accepted by creditors that are the holders of two-thirds in amount and more than one-half in number of Allowed Claims in each Impaired class who actually vote on the Amended Plan, if any and the Amended Plan otherwise satisfies the requirements of Section 1129(a) of the Bankruptcy Code. In the event the requisite acceptances are not obtained, and as explained in more detail below, the Bankruptcy Court may nevertheless confirm the Amended Plan if (i) the Bankruptcy Court finds that the Amended Plan accords fair and equitable treatment to such class, and does not discriminate unfairly with respect to the class rejecting it and (ii) at least one Impaired class has accepted the Amended Plan determined without considering the acceptances of any insider, and the Amended Plan otherwise satisfies the requirements of Section 1129(a) of the

Bankruptcy Code.

Provisional Ballots will be provided to the class 2 Secured Creditors as defined on pages 8 and 9, Classification and Treatment of Claims and Interests. In the event the Court determines that the class 2 Secured Creditors are Impaired, their vote to accept or reject the Amended Plan will be counted. If such class 2 Secured Creditors are found by the Court to be Unimpaired, their vote will not be counted.

**As the preceding paragraph makes evident, a successful reorganization depends upon the receipt of a sufficient number of Ballots accepting the Amended Plan. YOUR VOTE IS THEREFORE EXTREMELY IMPORTANT. Creditors should timely exercise their right to vote to accept or reject the Amended Plan, if they are entitled to vote.**

**Deadline for Returning Ballots.**  The Bankruptcy Court has directed that, to be counted for voting purposes, Ballots for the acceptance or rejection of the Amended Plan must be completed, signed, and be sent (by mail, email or fax), so as to be <u>received by counsel (for the Debtor) no later than August 17, 2020 at 5:00 p.m.</u> at the following address:

> Bronson Law Offices, P.C.
> 480 Mamaroneck Ave.
> Harrison, NY 10528
> Attn: H. Bruce Bronson
> hbbronson@bronsonlaw.net
> 888-908-6906 (fax)

**Voting Questions.** If you have any questions regarding the provisions or requirements for voting on the Amended Plan or require assistance in completing your Ballot, you may contact Debtor's counsel, H. Bruce Bronson, Esq. at 914-269-2530 or by email at hbbronson@bronsonlaw.net.

## **INTRODUCTION**

The Debtor filed this bankruptcy case (the "**Petition**") on March 8, 2019 (the "**Petition**

**Date**"). Debtor, David DePietto owns a business that assists attorneys in setting up, starting, and running new law firms. The Debtor previously filed a Chapter 13 which did not succeed due to an inability to negotiate a modification on his home mortgage with Ridgewood Savings Bank. Debtor's Petition for Chapter 11 was prompted by a foreclosure sale on his residence scheduled for March 12, 2019. He also has priority and secured claims from Internal Revenue Service and New York State tax liability. The Debtor believes he can resolve his financial situation by reorganizing under Chapter 11.

Debtor believes that he can repay under the Amended Plan all Priority Tax Claims to the extent he is liable to the Internal Revenue Service and New York State through monthly plan payments over a five-year period from the filing of the Debtor's bankruptcy petition. Further, the Debtor believes he can pay Ridgewood Savings Bank at the contract rate of $6,397 per month (including taxes and insurance) plus $2,326 per month to repay the arrears on its Allowed Secured Claim over a seventeen (17) year period beginning on the Effective Date of the Amended Chapter 11 Plan.

## SIGNIFICANT EVENTS DURING CHAPTER 11 CASE

The Debtor has continued to earn income since the Petition Date. The Bar Date is June 9, 2020, which is the last day for creditors to file proofs of claim. The bar date order was signed on April 8, 2020 [Dkt. No. 21] (the "**Bar Date Order**").

Bronson Law Offices, P.C. has been retained as general bankruptcy counsel for the Debtor and the retention order was signed on May 8, 2019 [Dkt. No. 12].

The Debtor has filed all monthly operating reports required to be filed to date.

## AMENDED PLAN SUMMARY

### UNCLASSIFIED ADMINISTRATIVE EXPENSE
### CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS

Pursuant to section 1123(a)(1) of the Bankruptcy Code, the Amended Plan does not classify Administrative Expense Claims and Priority Tax Claims, which shall be afforded the following treatment:

1. **Administrative Expense Claims**. All Allowed Administrative Expense Claims shall be paid in full in Cash on the later of the Effective Date, and entry of an order of the Bankruptcy Court allowing the same, unless otherwise agreed upon by the parties. The primary Administrative Expense Claims could consist of fees approved by the Court that are payable to bankruptcy counsel and post-petition taxes. The amounts of Administrative Expense Claims are not currently known; however, the Debtor has allocated $20,000 to the payment of such Claims.

2. **Priority Tax Claims**. Allowed Priority Tax Claims shall be paid in full in Cash on the Effective Date of the Amended Chapter 11 Plan as provided in their respective proofs of claim. The Internal Revenue Service ("IRS") has filed a Priority Tax Claim in the amount of $23.00, for periods through 2016, which will be paid in full. The Amended Plan contemplates paying the New York State tax for Allowed Priority Claims, for periods through 2018, in the amount of $504 on the Effective Date, in full.

| Claimant | Total Allowed Priority Tax Claim | Payment (including interest) |
|---|---|---|
| IRS (POC 3-2) | $23 | $23 (One-time Payment on the effective date) |
| NYS Dept. of Tax (POC 1-2) | $504 | $504 One-time Payment on the effective date |

3. **U.S. Trustee Fees.** Any unpaid U.S. Trustee Fees shall be paid in Cash on the Effective Date.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

1. **Class 1-Allowed Priority Claims.** Class 1 consists of all Allowed Priority

Claims, other than Priority Tax Claims.

**Treatment-** The Allowed Priority Claims, if any, shall be paid in full in Cash on the
Effective Date. No Allowed Priority Claims are expected.

**Right to Vote.** Class 1 is not Impaired under the Amended Plan and therefore is not
entitled to vote to accept or reject the Amended Plan.

2.      **Class 2-Allowed Secured Claims.** Class 2 consists of all Allowed Secured Claims
and is broken into two sub-classes: 2A and 2B.

A. Class 2A consists of the following Allowed Secured Claims secured by the Debtor's
residence: Ridgewood Savings Bank in the Allowed Amount of $501,493.29 (first mortgage on
residence). Debtor will pay this Allowed Secured Claim at the contract rate of $6,397, monthly.
Arrears of $474,367 will be paid over seventeen (17) years at the rate of $2,326 per month.[1]

B. Class 2B consists of the Allowed Secured Claims secured by  tax liens against the
Debtor's property: Internal Revenue Service in the Allowed amount of $116,911 and New York
State in the Allowed Amount of $1,035. The Debtor will pay New York State in full within ninety
(90) days of the Effective Date. The Debtor will pay the Internal Revenue Service claim $2,750 a
month over a period of forty-five (45) months at the statutory rate of interest.[2]

**Right to Vote.** Class 2A is not Impaired under the Amended Plan and is not entitled to
vote to accept or reject the Amended Plan, as such Claim will be paid, at the contract rate with all
arrears are being paid over 17 years pursuant to the Plan. Class 2B is also not Impaired under the
Amended Plan and is not entitled to vote to accept or reject the Amended Plan, as such Claims

---

[1] The payments of arrears are to be paid over the balance of the term of the mortgage. In the event there is a balance
due at the date set forth in the note and mortgage for final payment, such amount will become due and owing at that
time. Pursuant to 11 U.S.C.§§1123,1124, no interest is being paid on mortgage arrears and the claim is not impaired,
as the property is the Debtor's residence. *See In re Lennington*, 288 B.R. 802 (Bankr. C.D. Ill. 2003); *See also In re
LaPorta,* 578 B.R. 792 (Bankr. N.D. Ill. 2017); and *In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986).

[2] In the event that the payments as set forth herein cannot be completed within 60 months from the petition date, the
amount not paid at such time will be due and payable.

will be paid, within ninety days from effective date or over a period of forty-five (45) months at

the statutory rate of interest pursuant to the Amended Plan.

     3.     **Class 3-Allowed Unsecured Claims.** Class 3 Allowed Unsecured Claims consist

of the following, subject to reduction by objection of  the Debtor or on agreement of the parties

within 90 days of the effective date:

| Claimant | POC/Petition | Claim Amount Allowed | Amount to be Paid | Monthly Payment |
|---|---|---|---|---|
| Citibank, N.A.<br>P.O. Box 6030<br>Sioux Falls, SD 571117-6030 | POC 2-1 | **$89,993** | $30,000 | $500 |
| Ira A. Gorsky<br>121 Highland Ridge Rd.<br>Manalapan, NJ 07726-8641 | Petition 4.1 | **$6,717** | $1,500 | $25 |

     **Treatment-**The Class 3 Allowed Unsecured Claims will be paid $525 per month, for 60

months from the Effective Date in an amount equal to approximately 30% of such Allowed

Unsecured Claims. The Debtor may pre-pay the total amounts set forth herein at any time without

penalty or notice.

     **Removal of Lien.** The Debtor own's real property located at 22 Walbrooke Road,

Scarsdale, NY 10583 ("the "Property"). The property is the Debtor's primary residence and is

valued at $824,580.00. The Property is secured by two mortgages. The first mortgage is held by

Ridgewood and the total balance owed was approximately $1,074,619.27 as of the petition filing

date. The second mortgage is held by Citibank, N.A. ("Citibank")  and the total balance owed on

this mortgage was $89,993.23. The property valuation and proofs of claim showing the amounts

owed, are attached as "**Exhibit B**". The lien held by the Ridgewood, the first lien on the Property,

in and of itself, exceeds the Property's value. The amount owed to Citibank on the Property, is

therefore wholly unsecured pursuant to 11 U.S.C. §506(a). The Second Circuit has held that a

wholly unsecured mortgage lien may be stripped off. *Pond v. Farm Specialist Realty (In re*

*Pond)*, 252 F.3d 122 (2d Cir. 2001)(As applicable to Chapter 11 under 11 U.S.C. §1123(b)(5).

*See e.g., In re Van Eck*, 425 B.R. 54 (Bankr. D. Conn. 2010)).

Citibank has filed its allowed claim as unsecured and as such, is classified by this

Amended Disclosure Statement and the accompanying Amended Plan as an Allowed Unsecured

Claim.  To the extent Citibank has a lien on the Debtor's property, such debt will be deemed

unsecured and the lien will be void upon completion of the Amended Plan, pursuant to Sections

506(d) and 1141(c) of the Bankruptcy Code. Upon the payment of its pro rata distribution of the

amount available for unsecured creditors ($30,000), Citibank or the Debtor will file the necessary

documentation with the Clerk of Westchester County causing the lien to be removed from the

property records. The Debtor is expressly authorized to file these documents itself to have the lien

removed, upon completion of the Amended Plan.

**Right to Vote.** Class 3 is Impaired and entitled to vote to accept or reject the Amended

Plan. To the extent there are any holders of claims that were listed in the Schedules as disputed

that have failed to file a proof of claim, they will not be entitled to a distribution and are not

included herein. Unless otherwise ordered by the Bankruptcy Court for cause, only the Debtor

shall have standing to file and prosecute objections to Claims. All such objections shall be filed

and served no later than 90 days after the Effective Date in accordance with the applicable

provisions of the Bankruptcy Code and Bankruptcy Rules.

## IMPLEMENTATION OF THE AMENDED PLAN

Payments to holders of Allowed Claims under the Amended Plan will be made by the

Debtor/Reorganized Debtor from (a) Cash on hand as of the Effective Date, and (b) Cash realized

from the Debtor's/Reorganized Debtor's earnings following the Effective Date.

Professional fees for services rendered and expenses incurred by the Debtor's attorney

subsequent to the Effective Date in connection with the Amended Plan or the

Debtor's/Reorganized Debtor's chapter 11 case, may be paid by the Debtor without prior court

approval, to the extent that Section 1123(a)(6) of the Bankruptcy Code is applicable.

The Plan may be altered, amended or modified by the Debtor at any time before the

substantial consummation of the Amended Plan, as provided in Sections 1101(a) and 1127 of the

Bankruptcy Code and Bankruptcy Rule 3019, which authorizes the proponent of a plan of

reorganization to modify such plan at any time prior to confirmation of the plan so long as the

plan, as modified, continues to meet certain requirements therein.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**Executory Contracts and Unexpired Leases.** To the extent the Debtor is a party to any

executory contracts or unexpired leases which have not otherwise been assumed or rejected prior

to the Effective Date, the Confirmation Order shall constitute an Order authorizing the

assumption of such Executory Contract or unexpired lease pursuant to Section 365 of the

Bankruptcy Code.

In the event any lease or executory contract is to be assumed that is not paid currently, the

Debtor will, as a condition of assumption, cure the default by making payment of the amounts

owed. Any party objecting to the assumption or cure amount shall have until ten days prior to the

Confirmation Hearing date to oppose such assumption or cure amount. The Debtor is not aware of

any executory contracts or unexpired leases and accordingly believes that he owes no cure

amounts under Sections 365 of the Bankruptcy Code.

**This paragraph constitutes notice to any party having an executory contract or**

**unexpired lease with Debtor, that Debtor will pay no cure amounts unless (a) the non-debtor**

**party files and serves a statement setting forth the cure amount and objecting to the**

**Amended Plan on or before the date to object to Confirmation of the Amended Plan or (b)**

**the Court awards such cure amount.**

-12-

## RETENTION OF JURISDICTION

The Plan contains provisions providing for the retention of jurisdiction by the Bankruptcy Court to primarily enforce the Plan and implementation thereof through the sale of the Property as well as to determine all other matters pending on the date of confirmation and to issue the Debtor's discharge after the Amended Plan is fully paid.

After the entry of the Confirmation Order, the Bankruptcy Court shall retain jurisdiction until the bankruptcy case is closed to perform the following actions:

(a) Ensure that the Amended Plan is fully consummated;

(b) Resolve all matters arising under or relating to the Amended Plan;

(c) Allow, disallow, determine, liquidate or classify, any secured or unsecured claims;

(d) Grant or deny all applications for allowance of compensation and reimbursement of expenses by the professionals retained in the bankruptcy case;

(e) Resolve any motions or applications still pending prior to the Effective Date;

(f) Enter such orders as may be necessary or appropriate to implement or consummate the provision of the Amended Plan and all contracts, deeds, instruments made or created in furtherance of the Amended Plan or to enforce all orders, judgments and rulings entered in connection with the bankruptcy case; and

(g) Enter a Final Decree concluding the bankruptcy case.

## ACCEPTANCE BY THE IMPAIRED CLASSES

Under the Bankruptcy Code, the Plan may be confirmed if each Impaired class of Claims accepts the Amended Plan and the Amended Plan satisfies the other requirements of Section 1129(a) of the Bankruptcy Code. A Class is Impaired if the legal, equitable or contractual rights

-13-

attaching to the claim of that Class are modified other than by curing defaults and reinstating maturities or by payment in full in Cash. Class 3 is the only Impaired class and will be entitled to vote to accept or reject the Amended Plan.

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by the holders of two-thirds in dollar amount and a majority in number of the claims of that class who actually vote to accept or reject the Amended Plan.

## <u>OTHER PLAN REQUIREMENTS FOR CONFIRMATION</u>

At the Confirmation Hearing in addition to reviewing the balloting, the Bankruptcy Court will determine whether the requirements of Section 1129(a) of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order of Confirmation of the Amended Plan. These requirements include determinations by the Bankruptcy Court that: (i) the Plan has classified Claims in a permissible manner, (ii) the contents of the Amended Plan comply with various technical requirements of the Bankruptcy Code, (iii) the Debtor has proposed the Amended Plan in good faith, (iv) the Debtor has made disclosures concerning the Amended Plan that are adequate and include information concerning all payment made or promised in connection with the Amended Plan, (v) the Amended Plan is in the "best interest" of all creditors, in that it provides as good a recovery to the Creditors as a liquidation under Chapter 7 of the Bankruptcy Code, (vi) the Amended Plan is feasible, and (vii) the Amended Plan has been accepted by the requisite number and amount of creditors in each class entitled to vote on the Amended Plan or that the Amended Plan may be confirmed without such acceptances. The Debtor believes that all of these conditions have been or will be met prior to the Confirmation Hearing.

**Best Interest Test**. The so-called "best interest" test requires that each Impaired Claimant either (a) accepts the Amended Plan or (b) receives or retains under the Amended Plan property of

a value, as of the Effective Date of the Amended Plan, that is not less than the value such entity would receive or if the Debtor was to be liquidated under Chapter 7 of the Bankruptcy Code.

Without Plan confirmation, a Chapter 7 trustee may be appointed to attempt to sell the Debtor's assets. The Debtor's post-Petition Date income is not available to creditors in a Chapter 7 case, because, unlike in Chapter 11 and under the Amended Plan, it is not property of the bankruptcy estate in a Chapter 7 case. The Debtor's non-exempt assets have no value and accordingly the Debtor concludes that the Amended Plan provides a recovery, with a present value in an amount substantially greater than if a Chapter 7 trustee were appointed. See attached "**Exhibit C**".

**Feasibility.** For the Amended Plan to be confirmed, it must be demonstrated that consummation of the Amended Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor. Because the Debtor believes he has adequate wage earnings to carry out the Amended Plan, the Debtor believes he is likely be able to consummate the Amended Plan. Debtor's monthly operating reports show that Debtor has sufficient income to fund the Plan as set forth in the "Financial Projections of Debtor" attached as "**Exhibit D**". Copies of the Debtor's Monthly Operating Reports are available for inspection on the Court's Internet Website at http://www.nysb.uscourts.gov. A login and password to the Court's Public Access to Electronic Court Records ("PACER") are required to access this information and can be obtained through the PACER Service Center at http://www.pacer.gov. Copies of the Monthly Operating Reports may also be examined between the hours of 9:00 A.M. and 4:30 P.M., Monday through Friday at the Office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court, 300 Quarropas Street, Room 248, White Plains, NY 10601. Copies of the Debtor's Monthly Operating Reports may also be obtained by written request to Debtor's counsel.

"**Exhibit C**" sets forth a liquidation analysis. The analysis shows that Claimants are

receiving at least as much as they would have in a hypothetical Chapter 7 case.

**Projected "Disposable Income" Test.**

Pursuant to Section 1129(a)(15)(B) of the Bankruptcy Code, if the holder of an Allowed Unsecured Claim objects to the confirmation of the Plan, the Debtor will be required to demonstrate that the value of the property to be distributed under the Amended Plan is not less than their projected disposable income for the five (5) year period following the Effective Date. Based upon the projections attached to this Disclosure Statement as "**Exhibit D**", the Debtor has met the Projected "Disposable Income" Test by paying an amount equal to approximately 30% of the Class 3 Allowed Unsecured Claims.

**Confirmation Without the Acceptance of Each Impaired Class.**

In the event that all Impaired classes do not accept the Amended Plan, the Bankruptcy Court may nevertheless confirm the Amended Plan under Section 1129(b) at the Debtor's request if (i) all other requirements of section 1129(a) of the Bankruptcy Code are satisfied, (ii) at least one impaired Class of Claims votes to accept the Amended Plan without regard to any vote cast on account of a Claim held by "insiders" (as defined in the Bankruptcy Code) and (iii) as to each impaired Class which has not accepted the Amended Plan, the Bankruptcy Court determines that the Amended Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such non-accepting Class. **Here, there is only one impaired class-Class 3 so its vote in favor of the Amended Plan is very important.**

A plan "does not discriminate unfairly" if the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the non-accepting class, and no class receives payments in excess of that which it is legally entitled to receive for its claims or Interests. The Debtor believes that the Amended Plan meets these tests.

## CAUSES OF ACTION

The Debtor is not aware of any causes of action that their bankruptcy estate may have, including actions under Chapter 5 of the Bankruptcy Code. Nevertheless, he fully reserves his right to pursue any causes of action post-confirmation, and any setoff rights arising thereunder.

## FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

(a) The following is a summary of certain U.S. federal income tax consequences to the Debtor and to certain holders of Claims that are expected to result from implementation of the Amended Plan. This discussion is based on the Internal Revenue Code, as amended, Treasury regulations in effect on the date of this Disclosure Statement and administrative and judicial interpretations thereof that are available on or before such date. The pending tax legislation has not been analyzed and is not part of this discussion because it has not become law as of yet. It is unclear whether the Debtor will receive a benefit or detriment from such legislation. All of the following is subject to change which change could apply retroactively and could affect the federal income tax consequences described below. There can be no assurance that the IRS will not take a contrary view to one or more of the issues discussed below. No ruling has been applied for or received from the IRS with respect to any of the tax aspects of the Amended Plan and no opinion of counsel has been requested or received by the Debtor with respect thereto. The following summary is for general information only and does not purport to address all of the U.S. federal income tax consequences that may be applicable to any particular holder of a Claim. The tax consequences to holders may vary based upon the individual circumstances of each holder.

(b) In addition, this discussion does not address any aspect of local, state or foreign

taxation, or any estate or gift tax consequences of the Amended Plan. The following

assumes that the Amended Plan will be implemented as described in the Amended

Plan and does not address the tax consequences if the Amended Plan is not

implemented.

THE TAX CONSEQUENCES OF THE AMENDED PLAN ARE POTENTIALLY

COMPLEX AND SUBJECT TO SIGNIFICANT UNCERTAINTIES. THIS

DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION

CONCERNING THE MATTERS DESCRIBED. THERE CAN BE NO ASSURANCE

THAT THE INTERNAL REVENUE SERVICE OR ANY OTHER TAXING

AUTHORITY WILL NOT CHALLENGE ANY OR ALL OF THE TAX

CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF

ASSERTED, WOULD NOT BE SUSTAINED. EACH HOLDER OF A CLAIM IS

URGED TO CONSULT WITH THEIR OWN TAX ADVISOR REGARDING THE

FEDERAL, STATE, LOCAL, FOREIGN OR OTHER TAX CONSEQUENCES OF THE

AMENDED PLAN.

### Tax Consequences to the Holders of Claims

(a) The federal income tax consequences of the Amended Plan to a holder of a Claim will

depend upon several factors, including but not limited to: (i) whether the holder's

Claim (or a portion thereof) constitutes a Claim for principal or interest; (ii) the origin

of the holder's Claim; (iii) the type of consideration received by the holder in

exchange for the Claim; (iv) whether the holder is a residence to the United States for

tax purposes; (v) whether the holder has taken a bad-debt deduction or worthless-

security deduction with respect to its Claim, and (vi) whether the holder receives

distributions under the Amended Plan in more than one taxable year.

(b) Generally, a holder of a Claim will recognize a gain or loss equal to the "amount realized" which is equal to the sum of the Cash and the fair market value of any other consideration received under the Amended Plan in respect of a holder's Claim less its basis. The character of any recognized gain or loss (e.g., ordinary income or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the Claim in its hands, the purpose and circumstances of its acquisition, the holder's holding period of the Claim, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the Claim.

**HOLDERS OF CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

(c) Payors of interest, dividends and certain other reportable payments are generally required to withhold a percentage of such payments if the payee fails to furnish such payee's correct taxpayer identification number (social security number or employer identification number) to the payor. The Post-Confirmation Debtor may be required to withhold a portion of any payments made to a holder of an Allowed Claim who does not provide its taxpayer identification number.

### Release of Liens

Release of liens except as otherwise provided in the Amended Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Amended Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Amended Plan, all mortgages, deeds of trust, liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, liens, pledges, or other security interests shall revert to

the applicable Reorganized Debtor and its successors and assigns. To the extent that any holder of a Secured Claim that has had its Claim satisfied or discharged in full pursuant to the Amended Plan or any agent for such Holder has filed or recorded publicly any liens and/or security interests to secure such Holder's Secured Claim, as soon as practicable on or after the Effective Date or completion of payments under the Amended Plan, such holder (or the agent for such holder) shall take any and all steps requested by the Debtor, the Reorganized Debtor, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such holder's behalf.

## DISCHARGE OF DEBTS

Confirmation of the Amended Plan does not discharge any debt provided for in the Amended Plan until the Bankruptcy Court grants a discharge on completion of all payments under the Amended Plan, or as otherwise provided in Section 1141(d)(5) of the Bankruptcy Code. The Debtor will not be discharged from any debt excepted from discharge under Section 523 of the Bankruptcy Code, except as provided in Rule 4007 of the Federal Rules of Bankruptcy Procedure.

## LIMITATION OF LIABILITY; INJUNCTION

**To the extent permitted by Section 1125(e) of the Bankruptcy Code, upon the Effective Date, neither the Debtor nor his counsel or agents shall have incurred or shall incur any liability to any holder of a Claim or any other Person for any act or omission in connection with, or arising out of, the Amended Disclosure Statement, the pursuit of approval of the Amended Disclosure Statement, the pursuit of Confirmation of the Amended Plan, the consummation of the Amended Plan or the administration of the Amended Plan or the property to be distributed under the Amended Plan, except for willful**

**misconduct, gross negligence, self-dealing or breach of fiduciary duty. Nothing herein shall abrogate applicable disciplinary rules.**

**At the Confirmation Hearing, the Debtor will be seeking an injunction as of the Effective Date protecting the Debtor/Reorganized Debtor and his estate and assets, except as provided in the Amended Plan, until the entry of an order by the Bankruptcy Court granting the Debtor a discharge upon performance of all his duties and obligations under the Amended Plan. The injunction will be sought because under the Bankruptcy Code [11 U.S.C. §1141(d)(5)] where, as here, the debtor in a chapter 11 case is an individual, confirmation of the Amended Plan does not discharge any debt provided for in the plan until the Bankruptcy Court grants a discharge upon completion of all payments under the plan. Therefore, at the Confirmation Hearing, the Debtor will request the Bankruptcy Court to enter a Confirmation Order providing that, as of the Effective Date, as to every holder of a debt or Claim against the Debtor, such holder shall be enjoined from interfering with the Debtor's/Reorganized Debtor's ability to carry out the terms of the Plan or enforcing any remedy against the Debtor or his estate with respect to any Claim. The order will further provide that in the event of a default by the Debtor/Post-Confirmation Debtor under the Amended Plan, a Claimant may make an appropriate application to the Bankruptcy Court seeking relief from such injunction.**

## ADDITIONAL INFORMATION

Requests for information and additional copies of this Amended Disclosure Statement, the Ballots or Provisional Ballots and the other materials delivered together herewith and all deliveries, correspondence and questions, as the case may be, relating to the Amended Plan should be directed to the Debtor's counsel, Bronson Law Offices, P.C., 480 Mamaroneck Ave., Harrison, NY 10528, attn.: H. Bruce Bronson, Esq. at 914-269-2530;

hbbronson@bronsonlaw.net.


**The Debtor strongly urges you to vote in favor of the Amended Plan.**



**DATED:**        Harrison, New York
                July 8, 2020

*/s/David DePietto*
David DePietto                                    BRONSON LAW OFFICES, P.C.

                                        By:        */s/ H. Bruce Bronson*
                                                H. Bruce Bronson
                                                Bankruptcy Counsel to the
                                                Debtor and Debtor-in-Possession